452 So.2d 1161 (1984)
SUCCESSION OF Henry LYONS.
No. 83-C-2585.
Supreme Court of Louisiana.
May 14, 1984.
*1163 Milton E. Brener, Garon, Brener & McNeely, New Orleans, for applicant.
James H. Minge, New Orleans, for respondent.
WATSON, Justice.
The issues are whether decedent Henry Lyons: (1) wrote an olographic will; and (2) had testamentary capacity.
The trial court annulled the will, concluding that it was written and signed by Henry Lyons but that Lyons lacked testamentary capacity on that day. The court of appeal reversed, holding that the opponents of the will failed to carry their burden of proving testamentary incapacity. 441 So.2d 229 (La.App. 4 Cir.1983). A writ was granted to consider the judgment of the court of appeal. 444 So.2d 1216 (La., 1984).
Henry Lyons, seventy-four years of age, was admitted to Touro Infirmary on December 11, 1981, suffering from terminal cancer. The will is dated December 14. Lyons died on February 5, 1982. He had never married; his only survivors were nieces and nephews. In 1976, he had executed a statutory will in favor of his brother, but the brother predeceased him. The olographic will, which is the subject of this suit, names Henry Augustus Lyons, a nephew, as universal legatee. Plaintiffs are other nieces and nephews of Henry Lyons.
AUTHORSHIP OF THE OLOGRAPHIC WILL
An olographic will is one entirely written, dated and signed by the hand of the testator. LSA-C.C. art. 1588.[1] In a contest over probate of any will, the proponents must prove that the statutory requirements have been met. LSA-C.C.P. art. 2903.[2] In the case of an olographic testament, two credible witnesses must testify that the will was entirely written, dated, and signed in the testator's handwriting, and the court must be satisfied that the handwriting and signature are those of the testator. LSA-C.C.P. art. 2883.[3]
The will reads as follows:
"December 14, 1981
"I, Henry Lyons, Sr a resident of 2822 Louisiana Avenue New Orleans Louisiana Avenue [sic] make this my last will and testament i [sic] Bequeth [sic] all of the property that i (sic) own at the time of my Death to my nephew Henry Lyons I appoint him executor of my estate with full and free Seizin and Dispensed from giving any Security this my will written, dated and signed By me at New Orleans Louisiana in my own handwriting on this 14th day of December 1981.
 "Henry Lyons"
"One page only"
Although the writing on the will reflects an uneven hand, with lighter and darker areas, and a few of the letters are overwritten, *1164 this does not establish any legal infirmity.
Henry A. Lyons, the namesake nephew/universal legatee, and his sister, Velma Dennis, both testified that the will was in their uncle's handwriting. Cy David Francis Courtney, an attorney and an expert in handwriting analysis, compared the will to three samples of the decedent's handwriting and concluded that the will was written by Henry Lyons.
On the other hand, a niece and two nephews of the decedent testified that the will was not in the testator's handwriting, while another niece stated that portions of the will, particularly the signature, did not appear to be Henry Lyons' handwriting.
On cross-examination, one of the opponents of the will admitted he had authorized his attorney to hire a handwriting expert who examined a photograph of the will. This expert was not produced at trial. If a party to a lawsuit has a witness available whom he fails to call without explanation, it is presumed that the testimony of the witness would be adverse. Succession of Yeates, 213 La. 541, 35 So.2d 210 (1948); Succession of Riggio, 405 So.2d 513 (La. 1981).
Considering the contradictory nature of the lay testimony, the affirmative opinion of the handwriting expert, and the failure of the will's opponents to produce the missing expert, there was no error in finding that the will was proven to be written and signed by the decedent.
TESTAMENTARY CAPACITY
The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1472. To make a donation mortis causa, a person must be of sound mind. LSA-C.C. art. 1475. The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Moody, 227 La. 609, 80 So.2d 93 (1955). The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951); Succession of Riggio, supra.
There is a presumption in favor of testamentary capacity. Succession of Mithoff 168 La. 624, 122 So. 886 (1929); Succession of Lambert, 185 La. 416, 169 So. 453 (1936); and Succession of Riggio, supra. The proof required to overcome that presumption is disputed in the jurisprudence.
In Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278 (1880), an early will contest, the court stated that, "The presumptions of the law are in favor of capacity. These must be rebutted by conclusive proofs. Doubts must be resolved in favor of the will." 32 La.Ann. at 1069.
Succession of Mithoff supra, likened the requisite burden of proof to that required to overcome the presumption of innocence in criminal cases. In Succession of Lambert, supra, and Succession of Schmidt, supra, the courts relied on the Mithoff approach to uphold contested wills.
However, in LeBleu v. Manning, 225 La. 1087, 74 So.2d 384 (1954) the court cited Mithoff, Lambert and Schmidt as authority, but stated that the presumption of capacity could be destroyed by cogent, satisfactory and convincing evidence. LeBleu was followed by Succession of Riggio, supra.
The courts of appeal have adopted the stringent criminal standard of proof beyond a reasonable doubt. See Succession of Herson, 127 So.2d 61 (La.App. 1 Cir. 1961); Succession of Arnold, 375 So.2d 157 (La.App. 2 Cir.1979), writ denied 376 So.2d 1267; Guidry v. Hardy, 254 So.2d 675 (La. App. 3 Cir.1971); and Succession of Dubos, 422 So.2d 444 (La.App. 4 Cir.1982), writ denied 429 So.2d 132. However, a criminal standard of proof to overcome the presumption of testamentary capacity is inappropriate and can lead to anomalous results. See, for example, Succession of Collins v. Hebert, 377 So.2d 516 (La.App. 3 Cir.1979), writ denied 379 So.2d 15 (La., 1980).
*1165 The traditional measure of persuasion in civil cases is a preponderance of the evidence, but there are a limited number of claims and contentions governed by an intermediate standard, usually termed "clear and convincing evidence."
Generally, this third burden of proof requires more than a "preponderance of the evidence" but less than "beyond a reasonable doubt". The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence. Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976). This standard is usually employed "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds." McCormick on Evidence, Section 340(b), p. 798 (2nd ed. 1972).
In disciplinary proceedings, the burden rests on the bar association to establish proof of attorney misconduct by clear and convincing evidence. Louisiana State Bar Association v. Edwins, supra. Such a standard of proof is also levied against parties seeking to set aside transactions induced by fraud. Sanders v. Sanders, 222 La. 233, 62 So.2d 284 (1952); Placid Oil Co. v. Taylor, 345 So.2d 254 (La.App. 3 Cir.1977), writ denied 347 So.2d 261. Persons attempting to overcome the presumption of community property status[4] and children seeking to establish filiation to a deceased parent[5] must both satisfy this intermediate level of proof.
In all these situations, strong policy considerations mitigate against use of the preponderance of the evidence test. In the case of bar disciplinary proceedings, a stronger burden of proof has been adopted, despite the fact that the proceedings are not punitive. Instead, they are designed to protect the courts, the dignity of the legal profession and the public good. The accused is entitled to every favorable inference in his favor. In re Novo, 200 La. 833, 9 So.2d 201 (1942). In fraud cases, adoption of the intermediate standard upholds the security of transactions. In community property and filiation situations, the sanctity of the family is protected.
Strong policy considerations are also involved when testamentary capacity is disputed. As the court stated in Kingsbury v. Whitaker, supra:
"To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post-mortem robbery, which no court should sanction, unless thoroughly satisfied... that the testatory was legally incapable of making a will." 32 La.Ann. 1055 at 1062-1063.
These considerations require that a party alleging lack of testamentary capacity *1166 overcome the presumption of capacity by clear and convincing evidence.
In Pennsylvania the burden of proving testamentary capacity is initially with the proponent, but once execution of a will is proved by the required two witnesses, a presumption of testamentary capacity arises and the burden of proof shifts to the opponent to overcome the presumption by clear, strong, and compelling evidence. In re Estate of Kuzma, 487 Pa. 91, 408 A.2d 1369 (1979). In Wisconsin, an objector to a will must prove lack of testamentary capacity by clear, convincing and satisfactory evidence, while in Washington the opponent's burden is by clear, cogent and convincing evidence. See Matter of Estate of Sorenson, 87 Wis.2d 339, 274 N.W.2d 694 (1979) and In re Estate of Riley, 78 Wash.2d 623, 479 P.2d 1 (1970).
The evidence regarding Henry Lyons' testamentary capacity is contradictory. The universal legatee testified that he brought his uncle to the hospital on December 11, 1981. On December 14, 1981, he gave his uncle a form prepared by an attorney for use in preparing a will. According to the nephew, his uncle gave him an unsealed envelope containing the will early on the morning of December 15.
Velma Dennis and Wayne Lyons, the universal legatee's son, testified that they visited the decedent on several occasions while he was hospitalized. Both indicated that the decedent did not seem confused and seemed aware of what was going on around him. Neither saw the decedent on the day the will was written.
One niece, a registered nurse, saw the decedent on a single occasion while he was in the hospital and said he was confused and disoriented, but her testimony about the time of this visit was uncertain.
Another niece, who testified that she visited the deceased every day or every other day, admitted that he had good and bad days. A nephew indicated that several times during the hospitalization his uncle "made sense".
Still another niece testified that her uncle was incoherent in the hospital. While some of his sentences made sense, others did not. Nevertheless, on December 19, 1981, she was present when decedent signed some checks pertaining to a family estate. He apparently understood what he was doing. Decedent had surgery on December 30.
A nephew, the current executor of the estate, was steadfast in testifying that his uncle remained disoriented throughout his terminal hospitalization.
Impartial evidence concerning testamentary capacity included the nurses' notes and the testimony of one of the attending physicians. Dr. Johnny Gibson,[6] a general surgeon, saw the deceased on December 16, 1981, and again the next day, for five to ten minutes each time. Dr. Gibson had difficulty in communicating with the patient, who only understood after much repetition. In the doctor's opinion, Henry Lyons was not able to understand business transactions such as the disposition of his property at the time. However, the patient did sign consent forms for emergency treatment and operative procedures on December 11, December 21 and December 29. And significantly, Dr. Gibson appears as the medical witness to the "Consent to Treatment" form of December 29, 1981, (Exhibit 8) which casts some doubt on his assertion that decedent lacked understanding.
The nurses' notes indicate that on December 14, despite a temperature of up to 101.9 degrees, the decedent was "easily aroused" at 12:00 A.M., "alert" at 7:30 A.M., and "alert and oriented" at 4:00 P.M. Decedent was observed reading at 11:00 A.M. on December 13, and exhibited a good appetite on December 13, 14 and 15.
The opponents of this will failed to overcome the presumption of testamentary capacity by establishing with clear and convincing evidence that Henry Lyons lacked capacity when the will was made on December 14.
*1167 Accordingly, the judgment of the court of appeal is affirmed. The matter is remanded to the trial court for further proceedings consistent herewith.
AFFIRMED.
LEMMON, J., dissents for the reasons assigned in the dissenting opinion in the court of appeal.
CALOGERO, J., dissenting.
In my opinion opponents of the will should prevail on the testamentary capacity issue; and the dissenting judge in the Court of Appeal was correct concerning testator's signature.
NOTES
[1] LSA-C.C. art. 1588 provides:

"The olographic testament is that which is written by the testator himself.
"In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the State."
[2] LSA-C.C.P. art. 2903 provides:

"At the contradictory trial to probate a testament, its proponent bears the burden of proving the authenticity of the testament, and its compliance with all of the formal requirements of law."
[3] LSA-C.C.P. art. 2883 provides:

"A. The olographic testament must be proved by the testimony of two credible witnesses that the testament was entirely written, dated, and signed in the testator's handwriting. The court must satisfy itself, through interrogation or from the depositions of the witnesses that the handwriting and signature are those of the testator, and must mention these facts in its proces verbal.
"B. A person's testimony for the purpose of this Article may be given in the form of an affidavit executed after the death of the testator before a notary and two witnesses, unless the court in its discretion requires the person to appear and testify orally. All affidavits accepted by the court in lieu of oral testimny shall be filed in the probate proceedings. This Paragraph does not apply to testimony with respect to the genuineness of a will that is judicially attacked."
[4] LSA-C.C. art. 2340 provides:

"Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property."
See R.D.M. Corporation v. Patterson, 255 La. 301, 230 So.2d 820 (1970); Succession of Hemenway, 228 La. 572, 83 So.2d 377 (1955).
[5] LSA-C.C. art. 209, as amended by Act No. 527 of 1982, provides:

"A. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment (sic) under Article 203 must prove filiation as to an alleged living parent by a preponderance of the evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided by this Article.
"B. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment (sic) under Article 203 must prove filiation as to an alleged deceased parent by clear and convincing evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this Article.
"C. The proceeding required by this Article must be brought within one year of the death of the alleged parent or within nineteen years of the child's birth, whichever first occurs. This time limitation shall run against all persons, including minors and interdicts. If the proceeding is not timely instituted, the child may not thereafter establish his filiation.
"D. The right to bring this proceeding is heritable."
[6] The doctor's name appears in the transcript as "Gippson" but in all briefs as "Gibson".