519 So.2d 341 (1988)
SUCCESSION OF Joe B. HAMITER (Two Cases).
Nos. 19257-CA, 19258-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1988.
Writ Denied March 25, 1988.
*342 Smitherman, Lunn, Chastain & Hill by Richard S. Schmidt, and Pugh and Pugh by Robert G. Pugh, Jr., Shreveport, for plaintiffs-appellees Julia Andress and Mary Allen.
Richie & Richie by C. Vernon Richie, Shreveport, for defendants-appellants Rosanne Forrest, Margaret Dove and Chester Forrest (Cox).
Wiener, Weiss, Madison & Howell by Jacques L. Wiener, Jr., Shreveport, for Dative Testamentary Executor Commercial Nat. Bank of Shreveport.
Karin Adams, in pro. per.
Before JASPER E. JONES, FRED W. JONES, Jr. and NORRIS, JJ.
JASPER E. JONES, Judge.
Two proponents of a will, Rosanne Cox and Margaret Dove, appeal a judgment of the district court declaring the last will and testament of Joe B. Hamiter, formerly a judge of this court and a justice and chief justice of the Louisiana Supreme Court, to be a nullity.[1] We affirm.
The appellants made two assignments of error on appeal. They contend the trial judge erred in:
1) admitting evidence of undue influence; and
2) finding that the opponents of the will had proved by clear and convincing evidence that the decedent, Joe B. Hamiter, lacked testamentary capacity at the time of the execution of the May 24, 1985, will.
Justice Hamiter was born in 1899. He served in the legislature and on this court and the Louisiana Supreme Court. He retired as Chief Justice of Louisiana in 1971 and moved back to Shreveport with his wife.
*343 In 1972 Justice Hamiter broke his hip in a fall. Thereafter, Justice Hamiter walked only with a walker and frequently he used a wheelchair.
In 1981 Justice Hamiter's wife and brother both died.[2] Hamiter was very close to his brother and he deeply loved his wife. Hamiter was very depressed by these losses and continued to visit his wife's grave frequently until his death.
Justice Hamiter, in addition to his hip injury, suffered from arteriosclerosis. This condition progressed until, at his death, Hamiter had severely restricted blood flow to his brain.
After the injury to his hip Justice Hamiter was cared for in his home by a housekeeper and sitters. This situation persisted until Hamiter's death.
On July 2, 1981, Hamiter executed a will in which he left his home and some land to his nieces, Julia Andress and Mary Allen, the children of his brother, land to various relatives of his wife and some land, cash and a car to his housekeeper, Claudine Washington. The balance of his estate was left to the Boy Scouts of America.
In December, 1981, Hamiter made a second will. This will differed from the July, 1981, will primarily in its specific bequest of certain movables to Sue Brown, his wife's sister, and the substitution of a foundation he had created to benefit the Boy Scouts as the residual legatee.
In 1983 appellant Rosanne Cox met Justice Hamiter through Sue Brown, her landlady. On January 1, 1984, Mrs. Cox began working as a substitute sitter for Justice Hamiter. Thereafter, Mrs. Cox saw Hamiter on a regular and frequent basis at his home or at her home. Mrs. Cox's home was a camp on Cross Lake which had previously been owned by Hamiter and then given to Sue Brown. Mrs. Cox was paid sitter's wages for the weekends when Hamiter visited her home; however she testified that the payments were actually for another woman who worked at her home when Hamiter visited.
Mrs. Cox soon became active in the management of Hamiter's financial affairs. Concerns about possible mismanagement and abuse of Hamiter's finances led Hamiter's nieces, Julia Andress and Mary Allen, to file an action to interdict him in May, 1984. This action was concluded by an agreement to have Hamiter's accountant review his checking account and approve checks over $350.00.
The evidence shows Justice Hamiter was quite upset by this interdiction attempt. However, the evidence shows that he did not understand the nature of the action and became upset when it was explained to him by his longtime secretary, Margaret Dove. The evidence also shows that Justice Hamiter was not present when the agreement to resolve the suit was worked out but that Rosanne Cox was present and acted for him.
Justice Hamiter then executed a third will on May 31, 1984. In this will the specific legacies of land were generally the same as those contained in the December, 1981 will except that Mrs. Dove and Mrs. Cox were left parts of a tract previously left all to John Carroll Courtney and the home was left to Sue Brown. This will also left Hamiter's stocks, bonds and royalties to Mrs. Brown, along with the furnishings of the home. This will left $100,000.00 to a trust for the benefit of the Boy Scouts and designated Sue Brown as residual legatee of the remainder of the estate.
On May 24, 1985, Justice Hamiter executed the will annulled by the judgment appealed. This will contained a bequest to Claudine Washington of some land, cash and a car and a bequest of land to Jack Courtney. These legacies were contained in the earlier wills. This testament left 80 acres to Sue Brown, 60 acres and the home to Mrs. Dove and left most of Hamiter's other property to Mrs. Cox by individual legacies and as residual legatee. This will also included a legacy of twenty acres of land to Karin Adams, a television reporter who had met Hamiter only about two months before the execution of this will. The legacies to Mrs. Cox appeared to be by *344 far the largest bequest contained in this will.
On January 7, 1986, Justice Hamiter took his own life. These proceedings to annul the will Justice Hamiter executed on May 24, 1985 and probated on January 7, 1986 were filed in the Succession of Joe B. Hamiter by Julia Andress and Mary Allen.
Assignment # 1
At the nine day trial of this matter the appellees, Julia Andress and Mary Allen, presented much evidence to show Mrs. Cox's influence and control over Justice Hamiter. The appellants objected to this evidence upon grounds that such evidence is not admissible because of the provisions of Civil Code Article 1492 which states:
Art. 1492. Hatred, anger, suggestion or captation; proof inadmissible
Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation.
Appellees argue the evidence of undue influence was properly admitted to show the lack of testamentary capacity and mental weakness of Justice Hamiter. The appellees support this argument with authority.
In Cormier v. Myers, 223 La. 259, 65 So.2d 345 (1953), our supreme court, which included Justice Hamiter, adopted as its opinion the written reasons of the trial judge which included the following observation:
While our law (Article 1492, [LSA-] C.C.) does not recognize duress, force or undue influence unless they are present at the making of the will, yet such incidents are evidence of the testamentary incapacity and mental weakness of the testatrix. 65 So.2d at 349.
This language recognizes at least two exceptions to the general rule relied upon by appellants.
The supreme court again expressed this same view in Succession of Franz, 232 La. 310, 94 So.2d 270 (1957). This case and Cormier have been cited and relied upon by our courts of appeal. See Succession of Andrews, 153 So.2d 470 (La.App. 4th Cir. 1963); Guidry v. Hardy, 254 So.2d 675 (La.App. 3d Cir.1971), writ den., 260 La. 454, 256 So.2d 441 (1972).
Duress, force or undue influence are not grounds for declaring a will void unless they are present at the making of the will; however, evidence thereof is nevertheless admissible to show testamentary incapacity and mental weakness. Cormier v. Myers, supra; Succession of Franz, supra; Succession of Willis, 149 So.2d 218 (La.App. 2d Cir.1963); Succession of Andrews, supra; Guidry v. Hardy, supra.
Appellants' criticism of this exception to the rule of evidence contained in LSA-C.C. art. 1492 is not supported by authority. This assignment of error is without merit.
Assignment # 2
Through this assignment appellants contend that the trial judge erred in finding appellees had borne their burden of proof in attacking the testamentary capacity of Joe B. Hamiter.
In determining testamentary capacity the question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, 452 So.2d 1161 (La.1984).
There is a presumption of testamentary capacity which can only be overcome by clear and convincing evidence. Succession of Lyons, supra. The determination of testamentary capacity is a question of fact upon which the trial judge's findings will not be disturbed unless clearly wrong. Succession of Price v. Price, 448 So.2d 839 (La.App. 2d Cir.1984).
The issue presented here is: was the trial judge clearly wrong in finding the opponents of the will had rebutted by clear and convincing evidence the presumption that Justice Hamiter possessed testamentary capacity when he executed the will of May 24, 1985. There is strong support in the record for the trial judge's finding.
The evidence reflects that after Mrs. Cox entered the Hamiter household she soon became the dominant force therein. Mrs. Cox hired and fired sitters. She gave sitters instructions to change Justice Hamiter's *345 medication but destroyed a notation in the sitters' log reflecting those instructions. She undertook to rearrange Hamiter's insurance affairs. However, most significant is the evidence that Mrs. Cox undertook to take control of Hamiter's estate planning and that she succeeded in doing so.
Mrs. Heidi Anthony testified at trial. She was employed as a sitter from April 6, 1984, until May 7, 1984.
Mrs. Anthony testified that when Mrs. Cox learned of her acquaintance with Julia Andress she was instructed by Mrs. Cox not to associate with Mrs. Andress. She further testified that Mrs. Cox told her Mrs. Andress was a "troublemaker" who wanted Hamiter's money. Mrs. Anthony further testified Mrs. Cox stated she would "see to it" that Mrs. Andress did not get "a penny."
Mrs. Andress testified she visited her uncle in March, 1984, and on that occasion found Mrs. Cox reading her uncle's will. She further testified that Mrs. Cox commented the Boy Scouts were getting too much and that she would see that the family got it instead.
Mrs. Dorothy Crow, who had been Justice Hamiter's neighbor for twelve years, testified at trial. She testified Mrs. Cox called her after Hamiter's death and they had a conversation concerning the dispositions in his will. When informed of the legacy to Karin Adams, Mrs. Crow expressed surprise and Mrs. Cox responded by saying, "Well, I told Karin if she would be very good to him, I would make sure that she was in the will."
Claudine Washington testified she served as Justice Hamiter's housekeeper from the time he retired until his death. Mrs. Washington testified she had heard Mrs. Cox tell Hamiter that his nieces had stolen bonds from him. Mrs. Washington also testified that Mrs. Cox told Hamiter that his wife's sisters had taken some bonds. Mrs. Washington also testified that Hamiter told her he wondered why Mrs. Cox wanted Ms. Adams in his will.
Questioned concerning Mrs. Cox's relationship with Justice Hamiter, Mrs. Washington testified as follows:
Well, he would do anything she asked him to do. Anything she would tell him to do, he would do that for her.
In this connection the circumstances surrounding the execution of the will are quite significant.
The evidence shows that Mrs. Cox telephoned the office of the attorney who prepared the will and issued the instructions for its preparation. The evidence also shows that Mrs. Cox, with assistance from Mrs. Washington, took Justice Hamiter to the attorney's office for the execution of the will.
Once in the attorney's office Mrs. Cox knelt on the floor beside the chair in which Justice Hamiter was seated and read the will to him. She was excluded from the room while the will was signed but waited outside to take Hamiter home.
A comparison of the will of May 24, 1985, with Mrs. Cox's remarks concerning Hamiter's will shows that her wishes were incorporated into the will. Mrs. Andress and the Boy Scouts were excluded from the will and Ms. Adams was included. The evidence further shows that the will was prepared pursuant to Mrs. Cox's directions and executed under her influence and that she received substantial bequests in this will.
Further evidence of Mrs. Cox's control of Justice Hamiter was presented in the form of her handling of his financial affairs.
The record shows that throughout his life Justice Hamiter was very conservative with his finances. It was shown that he gave very modest gifts and was very frugal with his own purchases.
This is in stark contrast to the use of his funds after Mrs. Cox took over his affairs. Mrs. Cox admitted to having obtained from Justice Hamiter a $50,000.00 money order, insurance dividends of approximately $40,000.00, a check for timber proceeds for $11,000.00, $27,500,00 from the dissolution of the Hamiter Foundation, $25,000.00 as a gift, and a $13,000.00 tax refund check.
Under questioning concerning the total amount she had obtained from Justice Hamiter she testified as follows:
*346 Q. But there was at least three hundred thousand dollars that went into your account; is that correct?
A. That would probably be total. That would probably be total.
The testimony of Mrs. Cox's son, Robert Forrest, also shows that he was allowed to use a credit card, issued in her name but billed to Justice Hamiter, for trips to New York, Las Vegas and Lake Tahoe.
The evidence further establishes that Mrs. Cox used approximately $80,000.00 of Justice Hamiter's money in her control to pay a mortgage debt on the home of Sue Brown's daughter. She testified she had Hamiter's approval to make this very substantial expenditure.
At trial Mrs. Cox offered several conflicting explanations for what had become of Hamiter's money placed in her account. Despite her repeated statements that she had documents to corroborate these explanations they were never forthcoming.
The trial judge, in his excellent written reasons for judgment, evaluated the credibility of Mrs. Cox, a convicted felon, with the following statement: "In the five years since this Judge was elected, there has been no other witness to appear before him with less credibility." This evaluation of credibility is fully supported by the record.
The opponents of the will presented medical evidence to support their contention that Justice Hamiter lacked testamentary capacity. This testimony came from Dr. Paul Ware, M.D., a clinical professor at the LSU Medical School in Shreveport. Dr. Ware had practiced psychiatry and neurology prior to his return to academic medicine. Dr. Ware had training in forensic psychiatry.
Dr. Ware did not examine Justice Hamiter; however, he did examine the medical records obtained from Hamiter's usual physician as well as a psychiatrist who had examined him previously and Hamiter's hospital records and the Hamiter autopsy report.
Based upon his review of this information Dr. Ware opined that Justice Hamiter suffered from a chronic organic brain syndrome or a condition of damage to his brain, secondary to impaired blood flow to his brain and several prior strokes. Dr. Ware further testified that as of May, 1985, he did not believe Justice Hamiter was competent or had the ability to understand the complexities of a will and its results. He also testified that an individual with Justice Hamiter's conditions is extremely susceptible to "outside influences."
Dr. Seborn Woods also testified. Dr. Woods drove Justice Hamiter home from a wedding reception in downtown Shreveport in December, 1983. Dr. Woods testified Justice Hamiter could not tell him his home address nor could he give him directions to his home. Dr. Woods eventually found Hamiter's home by driving to the neighborhood where Hamiter lived and then driving around until Hamiter finally recognized enough to locate his home.
The appellants called Dr. Frank T. Dienst, M.D., an internist, to testify. Dr. Dienst was Justice Hamiter's usual physician.
Dr. Dienst testified that on each occasion he saw Justice Hamiter he tried to evaluate his competence. He further testified that, in his opinion, Justice Hamiter was competent at all times.
Dr. John N. Richie, M.D., a psychiatrist, was also called to testify by appellants. Dr. Richie examined Justice Hamiter on May 31, 1984, for the purpose of evaluating his testamentary capacity. Dr. Richie was of the opinion that Hamiter suffered from very mild organic brain syndrome but was competent to manage his affairs and make a will.
Dr. Ware was highly critical of the quality of the mental status examination performed by Dr. Richie on Justice Hamiter and characterized the examination as inadequate. Dr. Ware was particularly critical of Dr. Richie's failure to ask questions to evaluate Hamiter's cognitive functioning, memory and judgment. Dr. Ware also was critical of Dr. Dienst's failure to make adequate records of his examination of Justice Hamiter.
The appellants also presented testimony from a large number of lay witnesses. These ranged from a waiter at a restaurant where Hamiter ate on occasion to people *347 who saw him at church and included people who were guests in Hamiter's home for lunches which he held on Fridays.
These witnesses generally testified that Hamiter seemed oriented and his responses were appropriate. Viewed in more detail, this testimony reveals that when talking with friends or acquaintances from his earlier years Justice Hamiter could discuss in detail his opposition to Governor Huey P. Long when he was a legislator or his baseball playing days at LSU. However, when discussing current topics Hamiter's participation was usually limited to responses to other's remarks and he was unable to recall things such as the name of his cat or the people who had been invited to lunch.
Many of the lay witnesses called by appellants offered the opinion that Justice Hamiter was competent. However, there is no evidence these witnesses were aware of Hamiter's financial dealings with Mrs. Cox. The weight a witness's opinion should be given depends upon the accuracy of the facts upon which it is based. The opinions expressed by witnesses not shown to have information as to all important facts are not entitled to great weight. Cf. Interdiction of Escat, 206 La. 207, 19 So.2d 96 (1944); Gardiner v. Commercial Union Ins., 488 So.2d 1331 (La.App. 3d Cir.1986).
Appellants rely heavily on the testimony of the witnesses who were present at the execution of the will. They suggest that the testimony of these witnesses shows that even if Hamiter was otherwise incompetent he executed the will during a "window" of competence. Dr. Ware testified that a person in Hamiter's condition could have a lucid interval.
While a lucid interval is possible the evidence of the will witnesses does not establish that such an interval occurred. These witnesses did opine that Hamiter was competent at the time he executed the will. However, these opinions were expressed without any showing that the witnesses were aware of Hamiter's financial dealings or of Mrs. Cox's relationship with Hamiter.
Where a testator's insanity is shown to be habitual and constant there arises a presumption of insanity at the moment of the confection of the will. Cormier v. Myers, supra. The evidence presented, particularly the testimony of Dr. Ware and Mrs. Washington and the evidence of Mrs. Cox's financial dealings with Justice Hamiter, support a finding that Hamiter suffered from a constant and continuing mental incapacity. Under these circumstances it was appellants' burden to show the occurrence of a lucid interval at the time of the execution of the will.
The totality of the evidence in this matter strongly supports the trial judge's conclusion that Justice Hamiter lacked testamentary capacity on May 24, 1985. The medical and lay evidence shows convincingly that Justice Hamiter was under the control of Rosanne Cox as is illustrated by the large sums of money she obtained from this formerly frugal man and the putting into effect in the last will of her expressed wishes to exclude the Boy Scouts and Julia Andress from and Karin Adams in Hamiter's estate.
The evidence also shows that this will was executed by Hamiter while under the overbearing influence of Mrs. Cox. The will was read to Hamiter by Cox as she knelt beside his chair. Though she left the room while the will was signed she waited outside to take Hamiter home. She had directed the preparation of the will. The will was as Mrs. Cox wanted it. She made certain Hamiter was aware of this by reading the entire will to him. She made her desire for him to sign it clear by leaving him in the room for the purpose of doing so. He then did as she directed and expected.
This extraordinary involvement of the principal legatee in the formulation and execution of the will is very substantial evidence of undue influence present at the making of this will. The evidence of undue influence does not stop there, however.
The medical evidence shows that Hamiter suffered from the physical disability of organic brain syndrome which rendered him susceptible to influence. This medical evidence is buttressed by evidence from lay witnesses that shows Hamiter's condition to have been consistent with the medical diagnosis. Finally, the evidence of his financial *348 dealings shows that Hamiter allowed Cox to take at least $300,000.00 from him in only slightly over two years.
The evidence shows Hamiter's susceptibility to undue influence and the actual practice of such influence upon Hamiter by Cox. When Hamiter's testamentary capacity is considered in light of the evidence it is clear that Hamiter could not appreciate the nature or effect of his testament nor could he or did he employ independent judgment in making decisions concerning the disposition of and handling of his estate.[3]
The evidence in this record, when considered in light of the trial judge's well supported assessments of credibility, adequately supports the trial judge's finding that the presumption of testamentary capacity had been rebutted by clear and convincing evidence. This assignment of error is without merit.
Conclusion
The judgment is affirmed at appellants' costs.
NOTES
[1] Mrs. Cox frequently uses the name Rosanne Forrest and some witnesses knew her only by that name and she was frequently referred to as Rosanne Forrest in the record. However, because Cox appears to be her true and correct name we will use it to refer to her herein.
[2] Justice Hamiter and his wife had no children.
[3] Hamiter's inability to appreciate and understand legal documents is illustrated by the fact that he did not understand the interdiction proceedings when he was provided a copy of the petition. It was only after Mrs. Dove went over the documents with Hamiter and explained the effects of an interdiction that he became upset.