754 So.2d 328 (2000)
Charles E. CUPPLES and Thomas Edwin Cooper, Jr. as Executor of the Last Will and Testament of John Farguson Brown, Plaintiff-Appellant,
v.
Tracey PRUITT, as Executor of the Succession of John Farguson Brown and Kevin & Tracey Pruitt, Husband and Wife, Individually, Defendant-Appellees.
No. 32,786-CA.
Court of Appeal of Louisiana, Second Circuit.
March 1, 2000.
*329 Hamilton & Carroll by Orlando N. Hamilton, Jr., Oak Grove, Counsel for Defendants-Appellees.
Theodore J. Coenen, IV, Rayville, Counsel for Plaintiff-Appellant.
Before NORRIS, C.J., and STEWART and PEATROSS, JJ.
NORRIS, Chief Judge.
The plaintiff, Charles Cupples, appeals a judgment rejecting his suit to revoke the probate of a September 1996 will in which the testator, John F. Brown, gave all his property to the defendant, Tracey Pruitt. Cupples alleged that Mr. Brown lacked testamentary capacity and was unduly influenced by Ms. Pruitt when he executed the 1996 will; in its place, he sought to probate a July 1995 will in which Mr. Brown gave Ms. Pruitt a particular legacy and Cupples the residue. For the reasons expressed, we affirm.

*330 Factual and procedural background

The decedent, Mr. Brown (usually referred to by the witnesses as "Uncle John") had no children or close living relatives. He and his wife, Jessie, had spent much of their life in New Mexico; at some point they returned to live in Louisiana. Because he broke his hip and had various health problems, Jessie placed him in a nursing home in Rayville and then moved him to West Carroll Memorial Care Center in Oak Grove. According to testimony, Jessie looked after him constantly until her death in November 1993.
The defendant, Ms. Pruitt, was Jessie's second cousin; she testified that she assumed the role of Mr. Brown's family caregiver and friend. On November 11, 1993 Mr. Brown gave her a power of attorney to manage his affairs; the next day he executed a will making particular bequests to two cousins but making Ms. Pruitt his universal legatee. Ms. Pruitt hired a CPA to keep Mr. Brown's books; between him and Jessie, there was a large retirement account.
Ms. Pruitt visited Mr. Brown on a regular basis and occasionally drove him on errands outside the nursing home. In early 1994 she told him that her truck needed repairs; she testified that he gave her $5,000 to pay off the old truck and buy a new one. She also testified that in July 1995, he told her he wanted to give her and her husband, Kevin, "up to" $100,000. She reduced this to a handwritten note which Mr. Brown signed. The CPA honored the note without any qualms, but suggested that the Pruitts take only $10,000 apiece per year, so Mr. Brown would avoid gift tax liability. Ms. Pruitt testified that she visited him a lot, but because she was working and trying to raise her family, she was not often able to chauffeur him where he wanted to go.
The plaintiff, Charles Cupples, met Mr. Brown in early 1994, through Thomas Cooper, a Rayville attorney. Cooper had prepared Jessie's will and handled her succession in 1993; Cupples was a former client whom Cooper hired to do driving and light yard work for Cooper's elderly clients. A few months after Jessie's death, Cooper suggested to Mr. Brown that Cupples could be his friend and take him on excursions out of the nursing home. Mr. Brown hired him that day and retained him for about 19 months, until early August 1995.
Cupples testified that on one of their outings in July 1995, Mr. Brown complained that the Pruitts had "talked me out of everything I own." On July 31, 1995, Cupples drove Mr. Brown to Cooper's office in Rayville, where Mr. Brown executed two documents: (1) a power of attorney in favor of Cooper, and (2) a will giving Ms. Pruitt $20,000 cash, the house and real estate, but giving Cupples the residue cash, movables and securities. Cupples later testified that this will expressed Mr. Brown's true intent; Ms. Pruitt testified that in her view, Cooper and Cupples had manipulated Mr. Brown into signing these documents.
Having obtained the power of attorney, Cooper promptly sent Ms. Pruitt a demand letter, seeking an accounting of all of Mr. Brown's funds, accusing her of appropriating some T-bills, and requesting a meeting on August 5, 1995.
The meeting, however, did not materialize. Ms. Pruitt testified that she showed the demand letter to Mr. Brown, and it made him "very angry." Acting on his request, she notified nursing home personnel that Cooper and Cupples were to have no further contact with Mr. Brown. Ms. Pruitt then went to another lawyer, Donald Carroll, who prepared two documents that Mr. Brown signed: (1) a revocation of the power of attorney in favor of Cooper, and (2) an affidavit confirming that he really gave $100,000 to the Pruitts. The record shows that the CPA wrote various checks to Ms. Pruitt between then and late 1996, but she testified that these were all to meet Mr. Brown's expenses.
As long as he had been in the nursing home, Mr. Brown had severe respiratory *331 problems, was extremely overweight and incontinent. In December 1995, however, he had a "mini stroke," which kept him much more homebound. Administrators and nurses at the home began to chart him as "impaired," and in March and April 1996 he underwent speech therapy. Dr. Guinigundo, Mr. Brown's treating physician who saw him in the nursing home about once a month, testified that in September 1996[1] the patient was not mentally competent. Several other witnesses testified that Mr. Brown had "good days and bad days," but he was mostly aware of his needs and surroundings until close to the end.
In September 1996 Ms. Pruitt saw Mr. Carroll for an unrelated matter; she testified that the attorney advised her Mr. Brown wanted to write a new will. Carroll testified that back in 1995, Mr. Brown had told him "very clearly" he wanted to write a new will, leaving everything to Ms. Pruitt. Carroll prepared a notarial testament[2] and carried it to the nursing home on September 18, 1996. By this time Mr. Brown could not keep his eyes open long enough to read, or communicate easily; he could only mark the will with an "x." However, Carroll, one of the witnesses to the execution, and Ms. Pruitt all testified that Mr. Brown showed his approval by nodding when the will was read aloud, and reaching for the pen.
Ms. Pruitt testified that Mr. Brown's condition declined after September 1996. He died on Christmas day 1996.
Using the September 1996 will, Ms. Pruitt filed a suit for probate in late January 1997. On the date of filing, she obtained an order naming her executor of the estate and a judgment of possession giving her all of Mr. Brown's property.
In February 1997 Cupples and Cooper filed the instant suit. They sought to (1) revoke the September 1996 will for undue influence and lack of testamentary capacity; (2) void the inter vivos donations for undue influence and breach of fiduciary capacity; (3) probate the July 1995 will. Cupples claimed interest as a legatee, and Cooper as testamentary executor, under the July 1995 will. Before the matter came to trial, Cooper had passed away; Cupples proceeded alone.
At trial in January 1999, Cupples presented three days of testimony and documentary evidence, then rested. Ms. Pruitt moved for involuntary dismissal. The District Court ruled from the bench, granting the motion and dismissing the suit. The court concluded that Cupples lacked legal standing to attack the inter vivos donations, and that the September 1996 will met all the legal formalities for a valid will; these findings have not been appealed. The court further ruled that while Cupples had the burden of attacking the validity of the September 1996 will, he failed to prove that Mr. Brown lacked testamentary capacity to execute it or that Ms. Pruitt exerted undue influence over Mr. Brown.
Cupples has appealed, advancing three assignments of error. First, the District Court erroneously held him to the clear and convincing standard of proof rather than a mere preponderance to prove lack of capacity and the existence of undue influence with respect to the September 1996 will. Second, the court was plainly wrong to find Mr. Brown possessed the mental capacity to execute the September 1996 will. Third, the court was plainly wrong to find that Ms. Pruitt had not unduly influenced Mr. Brown to execute the September 1996 will.

*332 Discussion: Burden of proof

In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. La. C.C.P. art. 1672 B; Dampeer v. Dampeer, 96-0708 (La.5/3/96), 672 So.2d 176. The trial judge is required to evaluate the evidence and render a decision in accord with the applicable burden of proof. Silva v. Calk, 30,085 (La.App. 2 Cir. 12/10/97), 708 So.2d 418, and authorities therein. Thus a judgment of involuntary dismissal is subject to manifest error review. Silva v. Calk, supra; Sallis v. City of Bossier City, 28,483 (La.App. 2 Cir. 9/25/96), 680 So.2d 1333, writs denied 96-2599, 96-2592 (La.12/13/96), 692 So.2d 1063, 376.
By his first assignment Cupples urges the District Court erred in requiring him to prove "his case" by clear and convincing evidence instead of a mere preponderance. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation or executed the will. La. C.C. art. 1482.[3] Cupples does not argue that any other burden of proof applies to his claim of incapacity.
As for his claim of undue influence, however, Cupples urges that the correct burden of proof is a preponderance. La. C.C. art. 1483 provides:
A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
Ms. Pruitt admittedly occupied a position of confidence with Mr. Brown through the power of attorney. Cupples further argues that she was related only in the fifth degree (a second cousin) to Mr. Brown's wife, and therefore should not enjoy the "shield of a higher burden of proof." In support he cites art. 1483's Revision Comment (c):
The Article does not lower the standard of proof where a challenge is made against a confidante who is related to the donor by marriage, blood, or adoption ("affinity, consanguinity or adoption") because in many instances the most likely persons who would be involved would be a spouse or child. In those instances the nature of the evidence required to prove undue influence remains "clear and convincing evidence." (Emphasis added.)
Cupples argues that the legislature did not intend to extend the benefit of the higher burden to all relations, by marriage or blood, ad infinitum. Given Ms. Pruitt's distant relationship to Mr. Brown, Cupples urges this court to relax the burden of proof.
"Affinity" is defined as the relation which one spouse because of marriage has to blood relatives of the other spouse. State v. Serio, 95-338 (La.App. 5 Cir. 2/14/96), 670 So.2d 1273. Article 1483 plainly extends the protection of clear and convincing proof to any confidante who is related by affinity, consanguinity or adoption to the testator. Revision Comment (c) also states that the standard is relaxed "only where `the relationship of confidence' is more truly professional, such as that between doctor and his patient, or a minister *333 and his parishioner, and the person with whom the relationship exists is not a member of the donor's family." Notably, the comment does not say "immediate family," and in this sense restates the article. In short, we cannot find any basis for the distinction advanced by Cupples. The legislature is certainly able to differentiate between closer and more distant relatives, if that is the intent. See, e.g., La.C.Cr.P. art. 151, which permits the recusal of any judge who is related to the defendant, by blood or marriage, within the fourth degree, or to one of the attorneys within the second degree.[4] No such distinction is present in art. 1483.
This court applied the clear and convincing standard to the claim that a greatniece by marriage (fourth degree by affinity) had unduly influenced the testator in Succession of Gates, 32,348 (La.App. 2 Cir. 10/27/99), 746 So.2d 193. We applied the same standard to a case involving a niece and great-nephew (third and fourth degrees by consanguinity) in Succession of Anderson, 26,947 (La.App. 2 Cir. 5/10/95), 656 So.2d 42, writ denied 95-1789 (La.10/27/95), 662 So.2d 3.
We conclude that the proper standard of proof with respect to the claim that Ms. Pruitt, a second cousin by affinity who also held Mr. Brown's power of attorney, is clear and convincing evidence. The District Court did not err in this regard.

Testamentary capacity
By his second assignment Cupples urges the District Court was plainly wrong in failing to find that Mr. Brown lacked testamentary capacity to execute the September 1996 will. In support he relies on nurses' notes from the nursing home, the deposition of Mr. Brown's treating physician, Dr. Guinigundo, the testimony of the speech therapist, Ms. Carter, and portions of testimony by nurses who attended to Mr. Brown.
All persons have capacity to give and receive donations inter vivos and mortis causa, except as expressly provided by law. La. C.C. art. 1470. There is a presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161 (La.1984); Succession of Kilpatrick, 422 So.2d 464 (La.App. 2 Cir.1982), writ denied 429 So.2d 126 (1983). Testamentary capacity means the donor must "be able to comprehend generally the nature and consequences of the disposition that he is making." La. C.C. art. 1477; Succession of Lyons, supra; Succession of Dodson, 27,969 (La.App. 2 Cir. 2/28/96), 669 So.2d 642. However, a person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity when the donation was made or the testament executed. La. C.C. art. 1482; Succession of Lyons, supra; Succession of Dodson, supra. The issue of capacity is factual in nature; the ultimate finding that the testator possessed or lacked capacity cannot be disturbed unless it is plainly wrong. Succession of Dodson, supra, and authorities therein. The court may consider medical evidence, other expert testimony, and lay testimony; as such, there is no "litmus paper" test to apply to the evaluation of mental capacity. La. C.C. art. 1477, Revision Comment (f).
The thrust of Cupples's argument is that after a stroke in December 1995, Mr. Brown lost the mental capacity to understand the nature and consequences of writing a will. Some of the evidence, of course, supports this position. The nurses' notes show that in a December 1995 evaluation Mr. Brown was first reported to have severe physical and mental deterioration; subsequent exams recorded similar observations. An evaluation performed less *334 than two weeks before the September 1996 will noted "periodic" disordered thinking, moderate impairment, poor decision making (cues or supervision required), limited communications skills (making only concrete requests), and a host of physical problems.[5] One nursing home employee, Ms. Parker, stated that he was mentally competent "until the last time he got sick," and the director of nurses, Ms. Dunahoe, agreed that based on the nursing home records, Mr. Brown suffered a decline after December 1995. The speech therapist, Ms. Carter, testified that in March and April 1996 he suffered from both receptive and expressive aphasia, or inability to communicate. The treating physician, Dr. Guinigundo, felt from his general recollection that as of September 18, 1996, "I would not say that patient competent [sic]."
A significant amount of evidence, however, supports the opposite conclusion. Although she thought Mr. Brown declined after December 1995, Ms. Parker also testified that despite his physical problems, "I feel like he was pretty competent" and able to express his needs. Notably, Ms. Parker testified that on the day the will was executed, September 18, 1996, "I believe he was competent and oriented that day." This corroborates the testimony of Mandy Chop, one of the witnesses to the will, and Mr. Carroll, the attorney who notarized it. Ms. Chop recalled Mr. Brown could not keep his eyes open while the will was being read, but nodded in agreement and reached for the pen to place his mark on it.
We will not belabor the testimony of other witnesses, like nursing home employees Ms. Sullivan, Ms. Ball, Ms. Burgess, and Mr. Wiltcher, and the CPA, Ms. French. These witnesses all generally establish that even though his health and alertness were on the decline, Mr. Brown's condition fluctuated daily and he always could flash his old personalitystrong willed, argumentative, even truculent. The medical records standing alone would present a dim prognosis, but in light of the testimony they do not show that he failed to grasp the consequences of executing a will on September 18, 1996. See Succession of Kilpatrick, supra; Succession of Braud, 94-0668 (La.App. 4 Cir. 11/17/94), 646 So.2d 1168, writ denied 95-0383 (La.3/10/95), 651 So.2d 841.
Finally, we consider it significant that this will effectuates a testamentary intent that Mr. Brown had voiced since November 1993, when he made Ms. Pruitt his universal legatee. Later, in August 1995, Mr. Brown told his attorney, Mr. Carroll, that he wanted to change his will and leave everything to Ms. Pruitt. R.pp. 215-216. There is no question that Mr. Brown had full command of all his faculties at those times. To reiterate this intent in September 1996, despite his growing physical and mental problems, indicates a reasonable grasp of the nature and consequences of his actions.
On this record, we cannot declare the District Court was plainly wrong to find that Cupples failed to prove, by clear and convincing evidence, that Mr. Brown lacked mental capacity to execute the September 1996 will. This assignment lacks merit.

Undue influence
By his third assignment Cupples urges that the District Court was plainly wrong in failing to find that Ms. Pruitt unduly influenced Mr. Brown to favor her in his will. He argues that the law of undue influence is "relatively new in Louisiana" for the following reasons. Prior to 1990, the code prohibited the admission of proof that a disposition had been made "through hatred, anger, suggestion or captation." La. C.C. art. 1492 (repealed). In light of this nearly insurmountable burden, courts *335 considered evidence of influence only when it affected, or virtually destroyed, the mental capacity of the testator. See, e.g., Succession of Hamiter, 519 So.2d 341 (La. App. 2 Cir.), writ denied 521 So.2d 1170 (1988), and citations therein. In 1989, however, the legislature repealed art. 1492, and in 1991 enacted art. 1479, which specifically allows evidence of undue influence to nullify a will.[6] This change in the law shows a legislative intent to follow the guidance of common-law jurisprudence on undue influence. Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94), 633 So.2d 846; La. C.C. art. 1479, Revision Comment (b). Cupples argues that the District Court erroneously applied the pre-1991 law of captation to this case, and had it applied the more fluid concept of undue influence, it would have nullified Mr. Brown's September 1996 will. Specifically, he argues that Ms. Pruitt had the opportunity and the inclination to influence Mr. Brown, she isolated him from Cupples and Cooper, and Mr. Brown was unusually susceptible to influence.
Article 1479 provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
The accompanying Revision Comment explains that "mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of the donor and substitute someone else's volition for his own." See Succession of Braud, supra. Aside from the statutory definition, undue influence is generally understood to mean "the exercise of psychological domination over a person to the extent that the person cannot help but do what the dominating party wishes." Laurie D. Clark, Comment, Louisiana's New Law on Capacity to Make and Receive Donations: "Unduly Influenced" by the Common Law?, 67 TUL. L.REV. 183, 221 (1992), and authorities therein. Because Ms. Pruitt was related to Mr. Brown by affinity, the burden of proving that she unduly influenced him is clear and convincing evidence. La. C.C. art. 1483. The District Court's finding of (or failure to find) undue influence is fact intensive, and such a finding cannot be disturbed on appeal in the absence of manifest error. Succession of Anderson, supra.
We do not find that the District Court applied the pre-1991 law to this case. Under that law, evidence of undue influence would be admissible only to prove lack of mental capacity. Succession of Hamiter, supra. In oral reasons for judgment, the court clearly separated the two concepts, discussing and rejecting claims based on both. We perceive no legal error.
As with mental capacity, the evidence of undue influence was conflicting. Cupples argues the Ms. Pruitt, a struggling young mother who in 1995 could not even afford truck repairs, had an obvious financial motive for pursuing Mr. Brown's estate.[7] He cites his own testimony that in July 1995, Mr. Brown said the Pruitts had "talked me out of everything I've got." He interprets the events of August 8, 1995, as a two-hour star chamber in which Ms. Pruitt isolated Mr. Brown from "his attorney," Mr. Cooper, and from Cupples himself, resulting in Mr. Brown's letter to the nursing home enjoining any future contact with them. After a month of isolation from the only persons who could help him exercise free choice, Cupples argues, Mr. Brown had no alternative but to sign the *336 will that Ms. Pruitt and Mr. Carroll placed in front of him at the nursing home.
The record also shows, however, that as early as 1993 Mr. Brown expressed an intent to leave a significant legacy to Ms. Pruitt. Everyone present when he signed the September 1996 will testified that Mr. Brown, despite his diminished physical condition, indicated that it embodied his true wishes. Under the circumstances, Ms. Pruitt's involvement in executing the notarial will may be considered "mere advice and assistance," and insufficient to supplant Mr. Brown's will. The District Court obviously did not feel that Ms. Pruitt exercised psychological domination over Mr. Brown.
Moreover, the record does not show that Ms. Pruitt was an unlikely object of Mr. Brown's testamentary intent, such that leaving her everything was clearly and convincingly the result of substituting her volition for his. She was related to his late wife and apparently close to her family. She visited and entertained him regularly from the time he returned to Louisiana until his death. Because of his weight and other physical problems, tending to him on these occasions was not easy. In the last analysis, the District Court made a credibility call, rejecting Cupples's contention that Ms. Pruitt manipulated Mr. Brown to change his will and accepting Ms. Pruitt's claim that she was trying to help Mr. Brown and to honor his true wishes. The record supports a finding that Mr. Brown's largesse was a product of his affection and esteem for Ms. Pruitt, not her undue influence. On this record, we cannot say the District Court committed manifest error. This assignment lacks merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are assessed to the appellant, Charles E. Cupples.
AFFIRMED.
NOTES
[1] The deposition actually reads "July 18, 1996," but this is either a misstatement by Ms. Pruitt's counsel or a typographical error.
[2] At the time this was technically a "statutory will for those with sight impairment" under La. R.S. 9:2443; the substance of that statute is now contained in La. C.C. art. 1579 as one of the forms of notarial testament. See La. Acts 1997, No. 1421 (effective July 1, 1999).
[3] The statutory exception for donors who have been "judicially declared to be mentally infirm" is obviously not applicable to this case.
[4] Similar distinctions are drawn in La. C.C. art. 90 (prohibiting marriage between persons related within the fourth degree); La. R.S. 9:211 (legitimizing certain marriages between collateral relations within the fourth degree); La. R.S. 23:1472(19)(a) (requiring additional proof before enumerated relatives may claim unemployment benefits from family-controlled businesses); La. R.S. 38:1623 (prohibiting the appointment of a reclamation appraiser related within the fourth degree of consanguinity to any of the property owners).
[5] The diagnoses included stroke, dementia, Parkinson's disease, depression, emphysema, and total lack of bowel and bladder control.
[6] Former art. 1492 was repealed by La. Acts 1989, No. 788, and La. Acts 1990, No. 147, both effective July 1, 1990. It was yet again repealed by La. Acts 1995, Nos. 219 and 1180. Current art. 1479 was enacted by La. Acts 1991, No. 363.
[7] The detailed descriptive list filed in Mr. Brown's succession valued his estate at $254,103.92, on which Ms. Pruitt owed an inheritance tax of $16,661.04. R.p. 53-57.