WILLIAMS, J.
 

 l iThe plaintiffs, Buck Furlow and Ver-nell Furlow Jobe, appeal a judgment in favor of the defendant, G. Daniel Furlow, executor of the decedent’s estate. The trial court found that the plaintiffs failed to prove that the decedent lacked testamentary capacity at the time she executed her will in February 2003. For the following reasons, we affirm.
 

 FACTS
 

 In April 1996, Neva Furlow executed a will leaving all of her property in equal shares to her four children, Carl Furlow, Buck Furlow, Vernell Jobe and George Daniel Furlow (“Daniel”), who was named as executor. In April and May 1997, Dr. Joe Hooker and Dr. Woodfin Wilson signed affidavits stating their opinion that Neva Furlow was an incompetent adult who was unable to handle her personal and financial affairs and needed someone to manage those matters for her. Dr. Wilson last saw Neva in January 1997 and Dr. Hooker did not treat her after April 1997. During 1998, Neva traveled from Texas to Homer, Louisiana, where she stayed a brief time with Daniel before moving into Claiborne Manor Nursing Home. Dr. Mark Haynes began treating Neva at that time and saw her several times each month while doing patient rounds at the nursing home.
 

 On February 11, 2003, Neva Furlow executed a last will and testament before a notary and two witnesses. In contrast to her prior will, Neva left all of her property to her son, Daniel, and named him as executor. In April 2005, Buck Furlow sought to have his mother interdicted. In May 2005, the court-appointed curator of the putative interdict, attorney Henry Paul Garner, spoke with Neva at the nursing home. After that meeting, |2Garner wrote a letter to the parties’ attorneys stating that Neva had engaged in appropriate and coherent conversation and would oppose interdiction.
 

 In June 2007, the decedent, Neva Fur-low, died. Subsequently, Daniel filed a petition to probate the decedent’s February 2003 will and the court designated
 
 him
 
 as executor of the estate. In January
 
 *477
 
 2008, the plaintiffs, Buck Furlow and Ver-nell Furlow Jobe, filed a petition seeking to have the February 2003 will declared invalid on the grounds that the decedent lacked the mental capacity to execute the will. After a trial, the court found that the plaintiffs failed to prove by clear and convincing evidence that decedent lacked capacity at the time she executed the will on February 11, 2003. The trial court rendered judgment denying the plaintiffs’ request to nullify the decedent’s 2003 will. The plaintiffs appeal the judgment.
 

 DISCUSSION
 

 The plaintiffs contend the trial court erred in finding that they failed to meet their burden of proving that the decedent lacked testamentary capacity. Plaintiffs argue that the physician testimony stating that decedent was incompetent to handle her affairs constituted clear and convincing evidence that she lacked capacity to execute the February 2003 will.
 

 All persons have capacity to make and receive donations inter vivos and mor-tis causa, except as expressly provided by law. LSA-C.C. art. 1470. Capacity to donate mortis causa must exist at the time the testator executes the testament. LSA-C.C. art. 1471. There is a presumption in favor of testamentary capacity.
 
 Cupples v. Pruitt,
 
 32,786 (La.App. 2d Cir.3/1/00), 754 So.2d 328. Testamentary capacity means the donor must be able to | ^comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477;
 
 Cupples, supra.
 

 A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time he executed the testament. LSA-C.C. art. 1482;
 
 Cupples, supra.
 
 The issue of capacity is factual in nature; the ultimate finding that the testator either possessed or lacked capacity cannot be disturbed unless clearly wrong or manifestly erroneous.
 
 Cupples, supra; Succession of Dodson,
 
 27,969 (La.App. 2d Cir.2/28/96), 669 So.2d 642. The court may consider medical evidence, other expert testimony and lay witness testimony. As such, there is no “litmus paper” test to apply in the evaluation of mental capacity. LSA-C.C. art. 1477, Revision comment (f);
 
 Cupples, supra.
 

 In the present case, the plaintiffs introduced into evidence the affidavits of Drs. Joe Hooker and J. Woodfin Wilson, Jr., who used identical language to state in pertinent part:
 

 I am the attending physician for Neva L. Furlow of Shelbyville, Texas. I am qualified to make this statement and am doing so at the request of Vernell F. Jobe. Mrs. Neva L. Furlow is an incompetent adult unable to handle day to day affairs and to do those things necessary to protect and preserve her property and person. It is my opinion that Mrs. Neva Furlow will remain in this condition for an extended period of time....
 

 In addition, each physician testified by deposition. Dr. Wilson testified that he first recognized mental changes in the decedent in 1992 and that her condition became worse from that time until her last visit in January 1997. Dr. Wilson stated that he had diagnosed decedent with cerebral arteriosclerosis, a progressive condition. Dr. Wilson acknowledged that Rthere could be some temporary fluctuation in a patient’s condition and that a person with such a diagnosis could experience intervals of lucidity. Dr. Wilson testified it was possible that during a period of lucidity a person could understand the nature of his actions. He stated that medication could exacerbate one’s mental incompetence and that altering the medicine
 
 *478
 
 could improve a person’s mental outlook. Dr. Wilson testified that with respect to the decedent’s subsequent mental capacity, he would defer to the opinion of the physician who treated her after January 1997.
 

 Dr. Hooker stated that he did not recall how long he had treated the decedent and that he could not find her patient records. Dr. Hooker testified that his opinion of decedent’s incapacity was based on her increasing senile dementia and her inability to take medicine as directed. Dr. Hooker explained that in his affidavit, use of the term extended period of time meant many years or “even the rest of her life.” Dr. Hooker stated that he did not treat decedent after she moved to Louisiana. Dr. Hooker testified that it was possible, but not likely, that a person with dementia could improve at times and that a person could possibly recover her competency if she stopped taking a medication that was impairing her mental function.
 

 Dr. William Mark Haynes testified that as deputy coroner, part of his job involved assessing the mental competence of persons. Dr. Haynes stated that he began treating the decedent after she moved to Louisiana in 1998 and saw her approximately 2 to 3 times each month while making his rounds at the nursing home. Dr. Haynes testified that during these visits, he found decedent to be very alert, oriented to person, place and situation and | Bthat she was “a lively person who interacted with the other people at the nursing home.” Dr. Haynes stated that in February 2003, decedent experienced significant arthritis pain, but she sometimes played the piano, she was capable of making decisions for herself and actively participated in her daily care. Dr. Haynes opined that decedent was mentally competent during that period of treatment until the last two months of her life.
 

 Attorney James Hatch, who drafted decedent’s will and notarized the document, testified that on February 11, 2003, he went to the nursing home and presented the prepared will to the decedent. Hatch stated that he asked decedent to read the will and called in two witnesses from the nursing home. Hatch testified that he then asked decedent if she had read the will and if that was what she wanted to do and she replied yes. Hatch stated he did not recall any particular discussions with decedent about the will provisions and he had not seen her prior to the signing date. Hatch could not remember if he had previously spoken on the telephone with the decedent about her will, but said he had talked with Dan Furlow. Hatch testified that based on his observation, the decedent understood what she was doing in signing the will. Hatch stated that he would not have proceeded with execution of the will if he had believed decedent was not competent. Hatch did not recall if he was aware, before preparing the will in 2003, that Drs. Wilson and Hooker had opined that decedent lacked the capacity to manage her financial affairs. Hatch stated that if he had known that information, he probably would have been more concerned about decedent’s state of mind.
 

 Vernell Jobe testified that since 1997, the decedent had been a very | (¡confused person who was unable to make logical decisions. Jobe stated that based on her training and experience as a nursing home administrator, she was able to determine whether a person was mentally incompetent and that her mother did not understand the meaning of her actions when she signed the will in 2003. However, Jobe acknowledged that the decedent’s condition “fluctuated” while she lived in the nursing home. Jobe explained that at times, decedent seemed fine and she played the piano, but more often she did not recognize her own adult children and
 
 *479
 
 was incompetent. Jobe stated that she was not present when the decedent signed the will on February 11, 2003, and did not specifically know her capacity on that date.
 

 Buck Furlow testified that after the decedent moved into the nursing home, he and Jobe visited their mother approximately once every 3 to 6 weeks. Buck stated that although most of the time decedent did not know what was going on, there were times when decedent recognized faces and could follow the conversation. Buck testified that he did not believe the decedent was competent to sign any will and that he was not present when she executed the will in February 2003.
 

 Daniel Furlow testified that he visited decedent daily and that she was always able to manage her own affairs. Daniel stated that he was present in the room when decedent signed the will on February 11, 2003. He testified that at the time of signing, the decedent was oriented as to time and place and that she exercised her own free will in executing the testament.
 

 The trial court heard the conflicting medical and lay testimony regarding decedent’s mental capacity and weighed the credibility of the |7witnesses. The plaintiffs relied on the opinions of two doctors that the decedent was incompetent. However, those doctors had not treated decedent since 1997 and one of them, Dr. Wilson, testified that he would defer to decedent’s subsequent treating physician in assessing her capacity after that time. Dr. Haynes, who visited decedent on a regular basis at the nursing home, opined that decedent was lucid and competent in 2003.
 

 In addition, as noted by the trial court, attorney Hatch met with decedent on February 11, 2003, asked her to read the will and watched her sign the testament. Although Hatch apparently did not meet or speak with decedent before preparing the will, the plaintiffs did not present evidence to contradict his testimony that decedent indicated the will provisions reflected her wishes and that she was able to understand the consequences of her act at the time she signed the testament.
 

 Based upon this record, we cannot say the trial court was clearly wrong in finding that the plaintiffs failed to satisfy their burden of proving by clear and convincing evidence that the decedent lacked the mental capacity to execute the February 2003 will. The assigned error lacks merit.
 

 CONCLUSION
 

 For the foregoing reasons, the trial court’s judgment is affirmed. The costs of this appeal are assessed to the appellants, Buck Furlow and Vernell Furlow Jobe.
 

 AFFIRMED.