768 So.2d 743 (2000)
SUCCESSION OF Doyle C. BOISSEAU.
No. 33,861-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 2000.
*744 Perkins & Day by Kelley R. Day, Shreveport, Coleman & Mayo by Donald L. Baker, Shreveport, Counsel for Appellant, Louise B.T. Boisseau.
*745 Robert I. Thompson, III, Shreveport, Counsel for Appellee, James T. Saintignan, Sr., et al.
Before BROWN, CARAWAY and KOSTELKA, JJ.
BROWN, J.
The issue in this appeal is whether the trial court erred in nullifying a will. Finding no error, however, we affirm.

Facts and Procedural Background
Doyle Boisseau, aged 88, and Louise Burk Tyler, aged 84, were married in July 1994. This was a second marriage for both. A family crisis necessitated that Mrs. Boisseau care for three minor grandchildren and because Mr. Boisseau did not wish to live with the rather rambunctious children, in November 1995 he moved from the marital home into the Summerfield Estates Retirement Residence where he remained until his death on January 21, 1999.
Prior to his death, Mr. Boisseau executed three wills. In the first, a statutory will executed pursuant to La. R.S. 9:2442 and dated May 11, 1995, he bequeathed all of his property to Mrs. Boisseau. In the second testament, dated June 3, 1997, Mr. Boisseau left all of his property to relatives of his first wife and to his mother's foster children, James T. Saintignan, Jean Saintignan, John McKenney, Randy Thomas, Thomas James Casteel and Margaret Elizabeth Thomas Morgan (hereinafter referred to collectively as "the Saintignans"). Upon observing that Mr. Boisseau had to use a magnifying glass to read the will, attorney Don Baker, "out of an abundance of precaution," decided to include the additional attestation clause provided by La. R.S. 9:2443 for testators who are illiterate/sight impaired.
The third and final will was prepared in January 1999.[1] According to Mrs. Boisseau, her husband instructed her to prepare this testament by using as a guide the will that had been drawn up in 1995. Thereafter, on January 14, 1999, in the presence of a notary and two witnesses, Mr. Boisseau executed this will which, like the first one, left everything to Mrs. Boisseau. One week later Mr. Boisseau passed away.
On January 27, 1999 Mrs. Boisseau filed a petition for probate of the third will. An order of probate was signed by the trial court on January 28, 1999. On April 1, 1999 the Saintignans filed their petition to annul the probated testament, alleging incapacity and undue influence. They also sought to probate the second will.
Trial was held on September 14, 1999. The trial court found that Mr. Boisseau's eyesight was so poor that he was unable to read and declared the probated testament to be invalid and null because it did not comply with the formal requirements for a statutory will executed by a person who could not read.[2]
Mrs. Boisseau filed a motion for partial new trial on September 24, 1999. From the trial court's denial of this motion, she has appealed.

Discussion

Applicable Legal Principles
All persons have capacity to give and receive donations inter vivos and mortis causa, except as expressly provided by law. La.C.C. art. 1470. There is a presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161 (La.1984); Cupples v. Pruitt, 32,786 (La. App.2d Cir.03/01/00), 754 So.2d 328, writ denied, (La.05/26/00), 762 So.2d 1108; Succession *746 of Dodson, 27,969 (La.App.2d Cir.02/28/96), 669 So.2d 642.
Among other requirements, La. R.S. 9:2442 mandates that a testator must be physically able to read at the time that the testament is executed. Succession of McClinton, 98-989 (La.App. 3d Cir.02/03/99), 736 So.2d 906, writ denied, 99-0600 (La.04/23/99), 742 So.2d 885; Succession of Young, 96-1206 (La.App. 3d Cir.03/05/97), 692 So.2d 1149. A person physically impaired to the extent that he cannot read can still execute a statutory (now a notarial) will, but only in accordance with the requisite formalities. These additional requirements include that the written testament be read aloud in front of all the parties and that the testator declare that he heard it and that it is his will. An attestation clause setting forth this reading and declaration must be executed. Atkins v. Roberts, 561 So.2d 837 (La.App. 2d Cir.1990).
There is a presumption that a testament is valid. Id. A challenge to a testator's capacity requires proof of incapacity by clear and convincing evidence. The same is true with a challenge to a testator's ability to read. It is presumed that a testator can read and an opponent to the will must show that a testator is unable to read by clear and convincing evidence. Succession of Lyons, supra; Cupples, supra; Atkins, supra.
Whether a testator has the ability to read is a question of fact. In re Succession of McClinton, supra. A trial court's determination of that issue must not be overturned unless it is plainly wrong or manifestly erroneous. Cupples, supra; Succession of Dodson, supra.

Analysis
We will first address Mrs. Boisseau's assertion that the trial court committed legal error by applying the wrong burden of proof in determining that Mr. Boisseau was sight impaired.
The first crucial determination is one of fact, i.e., whether Mr. Boisseau was sight impaired to the extent that he could not read. Because it is presumed that he could in fact read, the applicable standard of proof to be borne by the opponents to the will is clear and convincing evidence. See Succession of Lyons, supra; Atkins, supra; Succession of McClinton, supra; Succession of Young, supra. Plaintiff contends that the trial court erroneously applied the less onerous preponderance of the evidence standard.
While the trial court initially appeared to apply the lesser standard, we note that in its reasons for denying Mrs. Boisseau's motion for new trial, the court stated:
The ... issue is the burden of proof.... The testimony was clearly that he couldn't read.... I think it was clear and convincing. The court has no doubt that the man couldn't read, that he lacked [the] physical ability to read. (Emphasis added).
It is apparent that the trial court, after some initial confusion over the applicable standard, applied the correct burden of proof on the issue of Mr. Boisseau's eyesight.
We will now address whether the trial court was clearly wrong in concluding that Mr. Boisseau could not read. The entire case is based on testimony. After reviewing the record, we find that the trial court was not clearly wrong in finding that the Saintignans met their burden of proving by clear and convincing evidence that Doyle Boisseau was sight impaired to the extent that he could not read when he executed the January 1999 testament.
The following is excerpted from the trial court's reasons for judgment:
The Court has listened carefully to the witnesses and reviewed the evidence ... I had an opportunity to evaluate the credibility of the witnesses and make credibility determinations based on listening to them and observing them *747 firsthand. Based on the testimony, the other evidence, and the credibility determinations, the Court will render the following opinion. There are times when the Court wishes it could split the baby. This is not one of those cases.... This is basically an all or nothing situation....
[T]he Court has heard a lot of testimony by numerous witnesses. Everyone agrees that the gentlemanthat is, Mr. Boisseauhad very bad eyesight. No one argues that his seeing or his eyesight was any good. Everyone admits that he had trouble seeing. I don't think a single person says that his eyesight was anywhere near normal. The question is: Was his eyesight so bad that he comes under the section of the law dealing with execution of a statutory will by someone whose sight is impaired to the extent that he cannot read? There is conflicting testimony on that issue, but everyone says his eyesight was bad. The Court, in listening to the witnesses, excepts (sic) as very credible the testimony of several witnesses. I'm going to go through and explain whose testimony and why. The firstthis is not to say that the Court believes the other witnesses have deliberately testified falsely. I just want to say that I am very impressed with certain witnesses. The first is Mr. Lipscomb (longtime friend of the decedent). That is because the best I can tell, he doesn't have any ax to grind with anybody. He didn't really stand to gain or lose anything and didn't appear to me to be desirous of helping either side in this case. The next witness that I think falls into that same category is Mr. Castellano (Mr. Boisseau's CPA) who I don't think has any ax to grind in this case or any desire to help or hurt any of the parties. The third witness that I believe to be very credible is Mr. Noel Fain. He works at Summerfield Estates (as the bus driver). I don't think there was any indication he has a desire to help or hinder either side. He has no personal interest in it. The last is Ms. Hartshorn who works at Kroger. The Court accepts these four witnesses' testimony....
Mr. Lipscomb says that Mr. Boisseau simply can't read.... He said he quit driving when he realized he couldn't see a car coming. He said he couldn't use a regular telephone because he couldn't see the numbers.... Mr. Castellano... says he can't read. He says Ms. Saintignan would have to put her finger where he signed. Mr. Fain says that he was basically physically able enough to get around. He dropped him off at the mall and he would pick him up. When he came back he had some indication of having shopped on occasion, and that he's seen him use a magnifying glass to sign a check.... Ms. Hartshorn ... works at Kroger. She knew him for some time and said that she would help him shop by reading the labels on the food at the store. Basically he would have to use a magnifying glass to see the line or an "X" that she would put on the check as to where he would sign the check....
The Court is of the opinion that Mr. Boisseau's eyesight was such that he could not read. The best he could do, frankly, is to use a magnifying glass to try to see where to sign his name. I have listened to all the witnesses and that is basically the conclusion that I have come to. That is buttressed by two other facts. The first is, there was enough of a problem with the earlier will that Mr. Baker talked about, that Mr. Baker was not comfortable in using the regular statutory will [format].... Testimony is he re-did the attestation clause and went through the process for someone who is sight impaired.... The last reason that the Court comes to the conclusion that he couldn't read is the simple fact that there had to be "Xs" placed on the testament where Mr. Boisseau signed his name.... There is no testimony of any physical reason other than eyesight as to why that would be necessary, *748 and the Court doesn't believe it would be necessary to put the "X" there if the man could read and see where to sign his name....
In any event, the Court concludes that this man could not read because he could not see. Therefore, the statutory will would have to follow the form in R.S. 9:2443.... This obviously was not done.... The Court, then, has to grant the petition to annul the testament as it was not in the appropriate form for someone who is sight impaired to the extent that they cannot read.
The court further stated, in its reasons for denying Mrs. Boisseau's motion for new trial:
[W]hat I did was take the witnesses that had no ax to grind in this matter... And if you take the ones that aren't associated closely with either side, then it falls definitely one way.... I mean, I took the independent ones that had no family relationship and had nothing at stake and weren't friends of either party particularly.... I discounted the people that were closely associated with the defendant because they, I think, had a close relationship. You take the ones that really had no ax to grind and it comes out clearly that this person couldn't read, didn't have the eyesight to read....
At trial I tried to do it as gently as I could by saying if you discount the testimony of the nonconnected parties, the evidence showed the man couldn't read.... I can tell you, I did not believe the testimony of one of the witnesses to the will. And I frankly did not believe the testimony that Mrs. Boisseau sat down and read him the will. That just did not appear credible to me.... And if you subtract everyone who wasn't directly related ... Everyone that did [not] have a dog in the hunt ...
Keeping in mind that resolution of conflicts in testimony and credibility determinations in succession proceedings are within the province of the trial court, and that, as such, they may not be overturned on appeal unless manifestly erroneous or clearly wrong, we cannot say that the trial court erred in determining that Doyle Boisseau was physically unable to read at the time his third will was executed.
La. R.S. 9:2443 (now C.C. art. 1579) mandates, for obvious reasons, that a statutory will executed by a sight impaired person be read aloud and acknowledged by the testator as an expression of his intent. Further, these requirements must be memorialized in the will's attestation clause. This was not done. We therefore affirm the trial court's ruling that the will is invalid for failure to comply with the applicable statutory requirements.

Conclusion
As set forth above, the judgment of the trial court is AFFIRMED. Costs are assessed to appellant, Louise Burk Tyler Boisseau.
NOTES
[1] We note that the law in effect at the time the wills were executed and at Mr. Boisseau's death, La. R.S. 9:2442 and 9:2443, was repealed and replaced by La. C.C. arts. 1577 and 1579, Act 1997, no. 1421, 51, effective July 1, 1999.
[2] The court, however, found no evidence of undue influence by Mrs. Boisseau in the execution of the will.