803 So.2d 195 (2001)
In the Matter of SUCCESSION OF Clarence Joseph GRAHAM.
No. 01-CA-676.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
E. Jeffrey Perilloux, LaPlace, LA, Attorney for Appellant.
William D. O'Regan, III, LaPlace, LA, Attorney for Appellee.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and CLARENCE E. McMANUS.
EDWARDS, Judge.
Ms. Shandelyn Smith appeals a judgment of the trial court denying her Motion To Annul the testament of Mr. Clarence Graham. For the reasons to follow, we set aside the findings of the trial court, conduct a de novo review of the record, and affirm the order of probate.
On July 27, 2000, Mr. Odell Wells presented to the trial court a Petition For Probate Of Notarial Testament. In that pleading, it was alleged that Clarence Graham died on August 30, 1999, and that the decedent had left a testament dated August 13, 1997 which Wells requested be filed and executed. It was further claimed that Mr. Graham could not read or write, but could sign his name, and that a second purported will dated March 25, 1999, did not comply with the provisions of La. R.S. 9:2443. Attached to the petition was a copy of the 1997 will admitted for probate, which named Mr. Wells and Ms. Maggie Crockerham as the sole legatees. That document contained an initial clause stating that Mr. Graham could not read or write, as well as a concluding attestation that the will had been read aloud by the *196 notary in the presence of the testator and three witnesses, and was appropriately signed.
Also attached to the petition was the 1999 will which declared Shandelyn Smith the sole legatee and executrix. That testament contained neither a reference to Mr. Graham's ability to read or write, nor an attestation clause, as in the previous document, of the will having been read aloud to him. Rather, that will appeared to be proper in form for an unimpaired testator. Accompanying the petition were an Affidavit Of Death And Heirship, a Petition For Confirmation Of Executor, an Executor's Oath, and Letters Testamentary.
On July 27, 2000, the court signed an order admitting the 1997 will for probate, and confirmed Mr. Wells testamentary executor of the succession of Mr. Graham.
On September 12, 2000, Shandelyn Smith filed a rule seeking to annul the order of probate, alleging that the 1999 will in her favor revoked the earlier testament. Following a contradictory hearing, the trial court denied the rule. It is from this judgment that Ms. Smith appeals.
In its judgment, the trial court found that Ms. Smith had the burden of proving the invalidity of the probated testament, and that she had not carried her burden of proof because the testimonial evidence clearly and convincingly established that Mr. Graham was unable to read. Therefore, the court reasoned that the 1999 will, failing to satisfy the formal requirements set forth in LSA-C.C. art. 1579 (formerly contained in R.S. 9:2443), was invalid and could not invalidate the probated testament.
Under ordinary circumstances, a notarial testament does not need to be proved.[1] Upon production of the testament, the court shall order it filed and executed and this order shall have the effect of probate.[2] The present case presents an unusual dilemma in that the trial court, prior to signing the order of probate, was presented with two notarial testaments, both of which appeared to be facially valid. The 1997 will was proper in form for a testator who could not read or write.[3] The 1999 testament was proper in form for one unimpaired. Had a copy of the 1999 will not been attached or presented to the court, the trial judge would have had no reason to question the 1997 will, the order of probate would have been valid, and a challenge by Ms. Smith to annul it would have required her to assume the burden of proof under LSA-C.C. 2932. That statute dictates that a plaintiff always has the burden of proving the invalidity of a notarial testament. As it stands, the court was offered evidence that two self-proving, albeit conflicting, testaments existed. Although it was alleged in the petition that Mr. Graham could neither read nor write, the existence of the 1999 notarial will put that fact at issue prior to probate, and the determination of that question is central to the resolution of this case.
Under these unique circumstances, we find that it was legal error for the trial court to sign the probate order without holding a contradictory hearing to determine whether or not Mr. Graham could read and write. This initial error resulted in the reversal of the burden of proof. The court was correct in determining that [a plaintiff] Ms. Smith had the burden of proving null a probated testament under C.C. P. Art. 2932. However, at a contradictory trial to probate a testament, the proponent of the will bears the burden of *197 proving the authenticity of the testament, and its compliance with all of the formal requirements of law.[4]
It is clear that the trial court did not consider the 1999 will when the order of probate issued. When the trial court makes a consequential error in the exclusion of evidence placed before it, no weight is accorded to its judgment and the appellate court may consider the entire record before it and decide the issue on the merits de novo.[5]
On its face, the second will appears to revoke the earlier one. Whether a testator has the ability to read is a question of fact,[6] and his ability to read is an element of testamentary capacity.[7] In order to prove the authenticity of the first will which he sought to probate, Mr. Wells had the burden to prove, by clear and convincing evidence,[8] that Mr. Graham lacked the testamentary capacity to execute the 1999 will because of his inability to read. The particular burden of proof imposed here requires more than a "preponderance of the evidence" but less than "beyond a reasonable doubt". The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence.[9]
Our review of the record reveals that at the hearing, Mr. Wells, Mr. Bobbie Franklin, Mr. Kelly Jones, and Mr. Wells' mother, Mrs. Lela Jackson, testified that they knew Mr. Graham could not read. Mr. Wells, a great-nephew of Mr. Graham, testified that he took care of Mr. Graham's business after his wife passed away. He knew Mr. Graham for all of his life and he could never read. Mrs. Jackson knew for a fact that Mr. Graham's wife took care of business during her lifetime, and that he could not read. Mrs. Jackson would take him to the doctor sometimes and he would hand papers to her to explain because he could not read. Messrs. Jones and Franklin were signatory witnesses to the first will. They were friends, not relatives, of Mr. Graham and had no interest in the outcome of the litigation. Mr. Franklin testified that Mr. Graham would always pick up a piece of paper or mail and let someone read it to him, usually Mr. Wells. Mr. Jones knew Mr. Graham for about 30 years, and when asked if Mr. Graham could read a little, he answered "Not really."
Mr. Victor Ortiz, the attorney who prepared the 1997 will, testified by deposition that Mr. Graham informed him on the morning the will was prepared that he could not read. Mr. Ortiz stated that he ascertained through conversation with, and interrogation of, Mr. Graham, that the testator could not read nor write, and thus prepared the will in the proper format.
*198 Ms. Smith testified at trial that after Mr. Graham was released from a nursing home where he had spent some time, he went to live with her and her mother. She stated that he handled his own business, reviewing various bills with her, and did not indicate that he was unable to read. Ms. Thelma Smith, mother of Shandelyn, also testified that Mr. Graham was her uncle and lived with her and her daughter for a time. She stated that he could read and write, and was very alert, taking care of his business.
After reviewing the record in its entirety, we find that the testimony of the two disinterested witnesses Kelly and Franklin, of Mr. Ortiz, and the signature of Mr. Graham to the will read aloud to him, attesting that he was unable to read or write, constitute clear and convincing evidence that Mr. Graham could neither read nor write.
A person physically impaired to the extent that he cannot read can still execute a notarial will, but only in accordance with the requisite formalities. These additional requirements include that the written testament be read aloud in front of all the parties, that the reading was followed on copies of the testament by the witnesses, that in their presence the testator declare that he heard it and that it is his will, and that he signed his name at the end of the testament and on each other separate page.[10] The primary purpose of the attestation clause is to certify that, at the time of execution of the testament, the statutory formalities have been satisfied.[11] An attestation clause setting forth this reading and declaration must be executed.[12] Wells, Franklin, and Jones testified that they heard the notary read the will aloud while they followed along with copies. The attestation clause with the required signatures was attached to the will. The 1997 will is in proper form, having met all requirements for a testator unable to read or write.
The formalities prescribed for the execution of a testament must be observed or the testament is absolutely null.[13] The 1999 testament in favor of Ms. Smith lacks the necessary attestation or any approximation thereof, for a testator unable to read and write. Therefore, although it is a later will, it lacks the necessary formalities and consequently is absolutely null.
For the foregoing reasons, we affirm the judgment of the trial court ordering probate of the 1997 will in favor of Mr. Wells. Each party is to bear its own costs on appeal.
AFFIRMED.
NOTES
[1] LSA-C.C. Art. 2891.
[2] Id.
[3] See former R.S. 9:2443.
[4] C.C.P. Art. 2903.
[5] See McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986); Fromenthal v. Delta Wells Surveyors, Inc. 98-1525 (La.App. 4th Cir.10/4/00), 776 So.2d 1, 6, writ denied XXXX-XXXX (La.3/16/2001), 787 So.2d 317.
[6] In re Succession of Boisseau, 33,861 (La. App. 2nd Cir.9/27/00) 768 So.2d 743, 746, writ denied 2000-C-2993 (La.12/15/00), 777 So.2d 1233; Succession of McClinton, 98-989 (La.App. 3d Cir.02/03/99), 736 So.2d 906, writ denied, 99-0600 (La.04/23/99), 742 So.2d 885.
[7] Succession of Fletcher, supra; Succession of McClinton, supra.
[8] See Succession of Lyons, 452 So.2d 1161, (La.1984); Succession of Fletcher 94-1426 (La.App. 3rd Cir.4/5/95), 653 So.2d 119, 121, writ denied 95-1105 (La.6/16/95), 655 So.2d 338.
[9] Succession of Lyons, supra.
[10] C.C. art. 1579. The requirements were formerly contained in R.S. 9:2443.
[11] Succession of Porche, 288 So.2d 27 (La. 1973).
[12] Succession of Boisseau, supra.
[13] C.C. art. 1573.