SUSAN M. CHEHARDY, Judge.
| ¡.This is a succession proceeding involving a contest over the validity of a will. We reverse the trial court’s determination that the will was invalid.
FACTS
Dr. Marion A. LaNasa, Sr. died on November 14, 2004. At the time of his death he was married to and living with his second wife, Barbara Parham LaNasa. His first marriage had ended with the death of his first wife, by whom Dr. LaNa-sa had five children (all majors by the time of his death). Dr. LaNasa had no other children.
On December 6, 2004 Dr. LaNasa’s children petitioned to file and execute a notarial will dated November 6, 2003. In that will Dr. LaNasa left particular legacies to his grandchildren, great-grandchildren, and his son Marion A. LaNasa. He left the remainder of his estate to be divided in *290 equal portions among his five children.[1] He stated further, “It is my specific desire that my present wife, Barbara LaNasa, get nothing from my estate. This includes but is not limited to any interest in my portion of community property, any usu-fructs or separate property.” He named his two sons to be executors of his estate.
|oOn December 7, 2004 the district court ordered that the will dated November 6, 2003 be filed and executed, that the estate be administered by independent administration, and that Marion A. LaNasa, Jr. and Anthony V. LaNasa be confirmed as independent co-executors.
On January 28, 2005, Mrs. Barbara La-Nasa filed a Petition to Annul Probated Testament. She alleged that the testament of November 6, 2003 is invalid because Dr. LaNasa was physically unable to read due to infirmity and, therefore, any testament by him must conform to the requirements of La.C.C. art. 1579. Article 1579 requires that where the testator is unable to read due to physical impairment, the purported testament must be read aloud in the presence of the testator, the notary, and two competent witnesses, and prescribes other formalities to be observed. Because the testament dated November 6, 2003 does not include a declaration that the formalities prescribed by Article 1579 had taken place, Mrs. La-Nasa alleged it is invalid.
Mrs. LaNasa further alleged that about the time the November 6, 2003 document was prepared and signed, she and Dr. LaNasa were quarreling; that Dr. LaNa-sa’s children encouraged his anger toward her, thus causing Dr. LaNasa to resent her; that Dr. LaNasa’s children seized upon his anger towards Mrs. LaNasa and drove him to an attorney with whom the decedent had no prior relationship for the purpose of having him execute a testament disinheriting his wife; that the actions and influences of Dr. LaNasa’s children resulted in the November 6, 2003 document whereby Dr. LaNasa disinherited Mrs. La-Nasa completely, in favor of his children. Mrs. LaNasa asserted that the alleged November 6, 2003 testament was the product of undue influence exerted by Dr. LaNa-sa’s children and should be declared null.
LThe executors opposed the petition to annul the testament. They admitted that Dr. LaNasa suffered from macular degeneration, but they asserted that he could read with the assistance of a reading machine, a device that magnifies documents onto a television screen. The executors contended that if a testator is able to read with magnification, the attestation clause is not necessary and, moreover, if a testator has the ability to read, his failure to actually read the will does not invalidate the will.
After a trial at which a number of witnesses testified, the district court took the matter under advisement and later rendered judgment finding the will invalid, as follows:
[I]n light of the fact that Dr. LaNasa did not have his or any other reading machine with him at the execution of the November 2003 will, the notarial testament should have been executed in accordance with the formalities of La.C.C. art. 1579. The Court finds that the November 2003 will does not meet the requirements of La.C.C. art. 1579 in that the testament was not read aloud assuring Dr. LaNasa, the notary and the witnesses that the instrument Dr. LaNa-sa signed was the instrument he intended to sign as his testament. Considering that the November 2003 will was not read aloud by the notary to Dr. LaNasa *291 and the witnesses and considering Dr. LaNasa was impaired to the extent that he could not read without his reading machine, the Court finds the November 2003 will to be invalid.
The executors appeal. They contend the trial court erred in determining that Dr. LaNasa’s November 2003 will required a sight-attestation clause in conformance with La.C.C. art. 1579, and in failing to grant judgment in favor of the executors. They frame the issues as whether a will must be executed in conformance with La. C.C. art. 1579 if the evidence is undisputed that the testator was able to read with magnification at the time the instrument was executed, and whether a testator who has the physical ability to read with the assistance of | ¡^instrumentality (ieeye-glasses, reading machine, etc.) must read the instrument prior to its execution in order for the vdll to be valid.
At trial the evidence concerned Dr. La-Nasa’s vision problems, the possible reasons he wished to disinherit his wife and, to a limited extent, possible bias of the witnesses to the signing of the will. The trial judge decided the case on the legal issue of whether the will was in the proper form for a person unable to read due to physical impairment. Mrs. LaNasa has not appealed the trial court’s failure to address the issue of undue influence. We limit our discussion of the evidence accordingly.
Dr. Rudolph Franklin, an ophthalmologist who specializes in diseases of the retina, testified he began treating Dr. LaNasa for severe macular degeneration in November 2000. By November 20, 2001,. Dr. LaNasa’s vision had deteriorated so much that he was “legally blind”: the vision in his best eye (the left eye) was 20/400, while the vision in his right eye was so poor he could not see fingers held in front of him farther than one foot away.[2] By September 9, 2003 — the visit closest to the date of execution of the contested will — Dr. La-Nasa’s visual acuity in one eye was so poor eye that when shown fingers he was unable to even tell whether it was one or two fingers, although he could tell there were hand motions in front of him. In the other eye he could count fingers at two feet. Dr. Franklin agreed Dr. LaNasa would have been considered legally blind on that date.
When Dr. Franklin next saw Dr. LaNa-sa, on December 23, 2003, he could see hand motions with the right eye, but a little later during the examination was able to count fingers at three feet, which is better vision than hand motions. With the left eye he could count fingers at four feet. Dr. Franklin said Dr. LaNasa would also be considered legally blind on that date. There was no reason for Dr. Franklin | fito think that Dr. LaNasa’s vision would have improved markedly between September 9, 2003 and December 23, 2003.
Dr. Franklin emphasized that due to poor visual acuity, Dr. LaNasa could not have read the will dated November 9, 2003, even with regular eyeglasses, but he may have been able to read it by use of a reading machine. Dr. Franklin recalled that Dr. LaNasa had told him he had purchased and used a reading machine at his home.
John M. Coman, Jr. testified he had been Dr. LaNasa’s attorney for many years and had prepared several testaments for him over the years: He identified a will Dr. LaNasa executed on October 8, 1997, and another will he executed on September 21, 1999. In each of those testa *292 ments Dr. LaNasa made significant bequests to Mrs. LaNasa.[3]
Coman also identified another document, which he stated was an unexecuted will drafted in 2004, following a lengthy conference at Coman’s office attended by both Dr. LaNasa and Mrs. LaNasa.[4] Dr. La-Nasa told Coman to mail him a draft and he would read it at home. Coman was aware that Dr. LaNasa could not read without the assistance of a magnifying machine. He mailed a draft of the will to Dr. LaNasa on or about October 25, 2004, with a note that said, “Please read and give me a call.”
Coman telephoned Dr. LaNasa seven to ten days later and asked him whether he had received and read the will. Dr. LaNa-sa replied that he had. Coman |7asked him whether he wanted any changes, to which Dr. LaNasa replied no. When Co-man inquired when they could get together to execute it, Dr. LaNasa did not give him an answer. According to Coman, the conversation terminated with the understanding that Dr. LaNasa would call Coman back, rather than Coman pursuing the matter.
Coman never heard from Dr. LaNasa again; Dr. LaNasa died approximately a week after Coman’s last conversation with him. Coman was not aware until long after Dr. LaNasa died that Dr. LaNasa had executed another will in November 2003.
Thomas Corrington testified he is an attorney and that he drew up the will at issue. He has known the LaNasa family for years because he is close friends with Peter Ascani, one of Dr. LaNasa’s grandsons; they own property together, and Ascani works as a legal assistant in Cor-rington-’s office. In addition, Ascani’s girlfriend, Catherine Babin, works for Cor-rington and was one of the witnesses to the will.
Corrington said that Dr. LaNasa phoned him on the morning of the date the will at issue was executed.[5] Dr. LaNasa told him he wanted a will drawn up, and told him what he wanted. Corrington said Dr. La-Nasa told him his wife had not come home the evening before, he was frustrated with their relationship, and how she treated him, and he wanted to write a will that effectively wrote her out.
*293 Corrington said he understood Dr. La-Nasa called him because he felt dominated by his wife and wanted to get the will done that day, before his wife came home. The conversation took place early in the morning. Dr. LaNasa dictated the basic terms of the will and Corrington drafted it, then call Dr. LaNasa back and read it to him. Dr. LaNasa made some minor changes, which Corrington |Reffected. Corrington then re-read the will to Dr. LaNasa and then gave a copy of it to Peter Ascani to take to Dr. LaNasa. Ascani took the document to Dr. LaNasa, then brought Dr. LaNasa back to Corrington’s office to execute the will.
Corrington said he did not recall reading the will aloud after Dr. LaNasa was in his office. Corrington testified he understood that Dr. LaNasa could read with difficulty because of his eye condition and he knew Dr. LaNasa had a reading machine.
Corrington asked Dr. LaNasa whether he had read the will and Dr. LaNasa told him he did. Then they went through the process of executing the will with the witnesses. Corrington did not read the will aloud because he did not feel it was required.
On cross examination Corrington acknowledged a discrepancy relating to the date on the will. The will is dated November 6, 2003 and in deposition Corrington stated the will was executed on Thursday, November 6, 2003. At opposing counsel’s request, however, he checked the document’s properties on his computer and learned that the document had been created on November 7, 2003 at 8:54 a.m., and that it was last modified on that same day at 4:12 p.m. Corrington said it was his error in typing the wrong date on the document, and that the document was definitely done on November 7th. He said he also erred in the date he handwrote on the document above his signature as notary.
Peter Ascani, Jr., Dr. LaNasa’s grandson,’ testified that his grandfather called him about wanting to do a will and asked him to put him in touch with the attorney he works for. After Corrington spoke to his grandfather and drafted the will, Asca-ni brought his grandfather the will. His grandfather was outside his home waiting for Ascani and when Ascani arrived and gave him the will, Dr. LaNasa took it and went inside. He came outside again after a few minutes, got into 1 sAscani’s car, and they went to Corrington’s office. Ascani said they did not discuss the will and he was not present when it was executed.
According to Ascani, everything that happened on. the day he picked up his grandfather to make the new will occurred “very fast.” When he brought the will to his grandfather, he knew his grandfather was going back inside to read it on his machine. Ascani admitted that he could not say for sure that his grandfather had read the will.
Mrs. Barbara LaNasa testified that on the night of November 5, 2003 she had gone to dinner with a friend, Marilyn Guercio. When they returned to Guercio’s home, both had had too much to drink, so Mrs. LaNasa decided to stay there. Mrs. LaNasa talked to her husband, who seemed to accept her decision to stay at Guercio’s. The next morning, however, when Mrs. LaNasa arrived back at home around 9:00 or 9:30 a.m., she found her key would not unlock the front door. She went in through the garage and found her husband was furious and had a workman there changing all the locks. Mrs. LaNasa said she did not leave the home for several days thereafter, because Dr. LaNasa would not give her a key to the new locks.
Mrs. LaNasa said Dr. LaNasa could not use his reading machine over that period of time because it had been unplugged and *294 he could not connect it himself. She refused to connect it for him because of the key incident — “He did it to me, I did it to him,” she stated. Thus, Mrs. LaNasa testified, Dr. LaNasa could not have used his reading machine to .read the will drafted by Thomas Corrington. Mrs. LaNasa did not reconnect the reading machine until the following Sunday, which was two to three days after the day on which the will was confected.
Mrs. LaNasa was not aware that Dr. LaNasa had made a new will. She knew that his grandson Peter came by the house once or twice, and she knew that |inDr. LaNasa left for a while, although she did not know where he went. She said the grandsons never came into the house when they came by to see their grandfather. She testified she stayed in the house all day and night for several days until she finally was given a key, and during that time she never observed Dr. LaNasa using his reading machine because the machine remained unplugged.
On cross examination, Mrs. LaNasa admitted her memory of staying in the house from Thursday through Sunday without leaving was faulty, when shown a restaurant bill indicating that she and Dr. LaNa-sa had gone out to dinner on the Friday evening during that period.
LAW AND ANALYSIS
There are now two forms for wills in Louisiana: olographic and notarial. La. C.C. art. 1577 prescribes the requirements of form for the notarial testament:
The notarial testament shall be prepared in writing and dated and shall be executed in the following manner. If the testator knows how to sign his name and to read and is physically able to do both, then:
(1) In the presence of a notary and two competent witnesses, the testator shall declare or signify to them that the instrument is his testament and shall sign his name at the end of the testament and on each other separate page.
(2) In the presence of the testator and each other, the notary and the witnesses shall sign the following declaration, or one substantially similar: “In our presence the testator has declared or signified that this instrument is his testament and has signed it at the end and on each other separate page, and in the presence of the testator and each other we have hereunto subscribed our names this _day of_,_”
La.C.C. article 1579 provides additional requirements where the testator is unable to read, as follows in pertinent part:
When a testator does not know how to read, or is physically impaired to the extent that he cannot read, 11 whether or not he is able to sign his name, the procedure for execution of a notarial testament is as follows:
(1) The written testament must be read aloud in the presence of the testator, the notary, and two competent witnesses. The witnesses, and the notary if he is not the person who reads the testament aloud, must follow the reading on copies of the testament. After the reading, the testator must declare or signify to them that he heard the reading, and that the instrument is his testament. If he .knows how, and is able to do so, ,the testator must sign his name at the end of the testament and on each other separate page of the instrument.
(2) In the presence of the testator and each other, the notary and witnesses must sign the following declaration, or one substantially similar: “This testament has been read aloud in our presence and in the presence of the testator, such reading having been followed on copies of the testament by the witnesses *295 [, and the notary if he is not the.person who reads it aloud,] and in our presence the testator declared or signified that he heard the reading, and that the instrument is his testament, and that he signed his name at the .end of the testament and on each other separate page; and in the presence of the testator and each other, we have subscribed our names this _ day of_,-”
A notarial testament does not need to be proved. La.C.C.P. Art. 2891. “Upon production of the testament, the court shall order it filed and executed and this order shall have the effect of probate.” Id. “The formalities prescribed for the execution of a testament must be observed or the testament is absolutely null.” La.C.C. art. 1578. In an action to annul a notarial testament, the plaintiff always has the burden of proving the invalidity of the testament. La.C.C.P. art. 2932(B).
A testator’s ability to read is an element of testamentary capacity. Succession of Graham, 01-676, p. 5 (La.App. 5 Cir. 11/27/01), 803 So.2d 195, 197. Whether a testator has the ability to read is a question of fact. Id. In the event that the trial court finds that the testator cannot read, the testament will only be valid if it comports with the procedures governing notarial testaments. In re Succession of Sandifer, 2005-860 (La.App. 3 Cir. 3/1/06), 923 So.2d 862.
In Succession of Maquar, 2003-0041, p. 9 (La.App. 4 Cir. 6/4/03), 849 So.2d 773, 778, writ denied, 2003-1873 (La.11/21/03), 860 So.2d 544, the Fourth Circuit stated that the additional formalities and requirements imposed by La.C.C. art. 1579 are to insure that the testator knows of the contents of the testament when he executes it, to protect him and his intended heirs from fraud or mistake. Thus, the requirement that the will be read aloud in the presence of the testator and that the witnesses and that.the attestation reflect that this was done, are directed at the problem of the testator who is unable to read the will himself, either through illiteracy or sight-impairment. ■ ■ ,
In Succession of Dugas, 400 So.2d 333, 334 (La.App. 4 Cir.1981), writ denied, 404 So.2d 1257 (La.1981), the court held that a testatrix was not disqualified from making a statutory will by her need for a magnifying lens to read. Similarly, a testator who can only read his will with glasses is “able to read;” within the meaning of the statute providing that those who are not able to read cannot make statutory wills. Succession of Harris, 329 So.2d 493, (La.App. 4 Cir.1976), writ denied, 332 So.2d 862 (La.1976).
There is a strong public policy in favor of. maintaining the will of the testator. “The intent of the testator controls the interpretation of his testament.” La. C.C. art. 1611(A). “A disposition should be interpreted in, a sense in which it can have effect, rather than one in which it can have none.” La.C.C. art. 1612. There is a presumption that a testament is valid, which can be rebutted only with compelling proof. Succession of Smith, 01-930 (La.App. 5 Cir. 1/15/02), 806 So.2d 909, 911, writ denied, 2002-0633 (La.5/3/02), 815 So.2d 105.
The evidence established that Dr. LaNa-sa initiated contact with the attorney, Thomas Corrington; Dr. LaNasa dictated the contents of the will to Corrington; Dr. LaNasa indicated to the witnesses in Cor-rington’s office that he had read the will 11sand agreed with its contents. Further, his grandson brought the will to Dr. LaNa-sa’s home and Dr. LaNasa took the will inside the house for several minutes before returning outside with it in order for Asca-ni to take him to Corrington’s office.
*296 The testimony establishes that, from the time the will was delivered to Dr. LaNasa by his grandson Peter Ascani until the time it was executed at Thomas Corring-ton’s office, it was never out of Dr. LaNa-sa’s possession. When Corrington asked Dr. LaNasa whether he had read the will, Dr. LaNasa replied in the affirmative, stating it was what he wanted.
Although Dr. LaNasa was unable to read with the naked eye or with glasses due to his severe macular degeneration, he could read by using a reading machine, and he had such a machine at his home.
We conclude that because Dr. LaNasa could read with magnification, the formalities of La.C.C. art. 1579 were not required. The testament dated November 6, 2003 complied with the formalities of La.C.C. art. 1577; therefore, it is valid.
For the foregoing reasons, the judgment of the district court is reversed and the petition to annul the probated testament is dismissed. Costs are assessed against the appellee, Barbara LaNasa.

REVERSED.

. The children are Marion A. LaNasa, Jr., Anthony V. LaNasa, Marietta Eileen LaNasa Ascani, Gloria LaNasa Azzarello, and Elaine LaNasa Yuratich.

. Dr. Franklin said "legally blind” refers to vision that cannot be corrected to 20/200 or better. He stated that "legally blind” is a legal rather than a medical term.

.In the will executed in 1997, Dr. LaNasa bequeathed to Mrs. LaNasa the right to be buried in the family tomb; $25,000.00; a 1993 Cadillac; lifetime usufruct of 550 Aris Avenue in Metairie; and directed that his estate pay the mortgage note on that home until and unless she were to remarry. He also left her $700.00 a month until she is able to collect his Social Security or other Social Security benefits.
In the will executed in 1999, Dr. LaNasa directed that his estate pay off the mortgage loan on 550 Aris Avenue in Metairie "to enure to the benefit” of his wife. He also bequeathed to Mrs. LaNasa $100,000.00; the right to be buried in his tomb; and usufruct of his boathouse until her remarriage. Further, he ordered that his estate pay Mrs. La-Nasa $1,000.00 per month until she reaches age 65 and that "after being married ten years, beginning with the eleventh year,” his executor and estate pay Mrs. LaNasa $10,000.00 per year, to terminate on her 65th birthday.

. In the unexecuted 2004 will, Dr. LaNasa left his wife $100,000.00, to be paid first out of the estate; usufruct over their jointly-owned property at 550 Aris Avenue and 801 Rue Burgundy Street, Apartment 314, for five years after his death; the right to be buried in his tomb; and the right to remove her personal belongings from the boathouse within six months.

. The date on the will is November 6, 2003, but Corrington remembers the date on which they confected the will as being November 7, 2003.