Judgment rendered November 15, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,360-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF
BETTY CAROLYN LEGGETT WOOD

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. P-2018-2523

Honorable Alvin R. Sharp, Judge

* * * * *

| | |
|---|---|
| HUDSON, POTTS & BERNSTEIN, LLP<br>By: Margaret H. Pruitt | Counsel for Appellants,<br>Deborah Lynn Wood and<br>Chad Lee Wood |
| | |
| BREITHAUPT, DUBOS, &<br>WOLLESON, LLC<br>By: R. Alan Breithaupt<br>    James R. Close | Counsel for Appellees,<br>Eddie Lee Wood, Jr., and<br>Carl Stephen Wood |

* * * * *

Before PITMAN, COX, and STEPHENS, JJ.

**PITMAN, C. J.**

Appellants Deborah Wood and Chad Wood ("Debbie" and "Chad") appeal a judgment granting a new trial and reversing a judgment that recognized a will from 2015 in the succession of the decedent, Betty Carolyn Leggett Wood ("Betty"), her mother and his grandmother, respectively. The same judgment deemed a will from 2018 to be valid, which was presented to the court by Betty's sons, Eddie Wood ("Eddie") and Carl Wood ("Buddy"). For the following reasons, we grant the appeal, vacate the judgment of new trial, vacate the subsequent judgment of the trial court and reinstate the original judgment.

## FACTS

Betty, a resident of Ouachita Parish, died on July 14, 2018. Debbie and Chad filed a petition to probate Betty's last will and testament, which was signed in notarial form by Betty on June 18, 2015 ("Will I") and attached to the petition.[1]

The petition alleges that in 2017, Betty was diagnosed with Alzheimer's dementia by her personal physician, Dr. Owen Meyers. It also alleges that on February 27, 2018, another last will and testament ("Will II") was executed by Betty. Attorney Bobby Underwood prepared Will II for Betty, and it was also attached to the petition.[2] Debbie and Chad alleged

---

[1] In Will I, Betty bequeathed to her grandson Chad the house and property located at 176 Russell Earl Road in Ouachita Parish. To Debbie, Betty bequeathed the house and property (seven acres) located at 2977 Winnsboro Road, two burial plots in Monroe, Louisiana, money in a Chase checking account, two cars, a 1975 lawn tractor and household goods and effects. To her three children, Debbie, Eddie and Buddy, Betty bequeathed, in equal proportions, her Ouachita Valley Federal Credit Union accounts, including any money, savings, vacation club, certificates of deposit and an IRA. Debbie was appointed as executrix in Will I.

[2] Will II bequeathed all of Betty's patrimony to Eddie and Buddy in equal proportions, to the exclusion of Debbie and Chad, heirs under Will I. It named Buddy as the executor.

that at the time of the making of Will II, Betty lacked the mental capacity to make a donation *mortis causa* because she was unable to generally comprehend the nature and consequences of the disposition she was making. They also alleged that Betty was under the complete care and control of Eddie and Buddy; and as a result of her diagnosis of Alzheimer's dementia and her lack of mental capacity, she was subject to undue influence at the time of executing Will II. They prayed that Will II be declared an absolute nullity for Betty's lack of testamentary capacity and undue influence, and that Will I be authenticated and probated as Betty's last will and testament.

Debbie and Chad filed a second amended petition and raised the issue of a donation *inter vivos* to Eddie of the property Betty originally bequeathed to Chad in Will I. The donation to Eddie was made the same day that Betty signed Will II.

A bench trial was held over five days, February 23-24, 2021, and December 8-10, 2021.

Debbie testified that she lived with her mother at her mother's house at 2977 Winnsboro Road from October 2017 through mid-February 2018. She stated that prior to her father's death in May 2005, she lived next door to her parents and saw them every day. After she moved, she talked on the phone to her mother four or five times a day. She stated that her relationship with Eddie over the years was decent, but that they drifted apart and her relationship with Buddy was complicated and one she tried to avoid.

Debbie also testified that Chad is Eddie's son and that she loves him as much as her own son. She noted that he was always available and reliable to help her with her mother and that Betty loved him very much.

2

Debbie further testified that in June 2015, she drove Betty to attorney Pat Wright's office, where she executed Will I. Wright had been Betty's attorney for at least ten years. Debbie stated that her mother explained the dispositions in Will I to her in great detail that day. Betty left a house and some land to Chad because Eddie had provided for his other children, but not for Chad; she left a house to Debbie with the understanding that Debbie would divide the property equally.[3]

Debbie stated that Betty left her the money in the Chase Bank checking account for the purpose of paying her final expenses, household bills and any outstanding bills she owed. The remainder of the money was to be divided equally among the siblings. The credit union account was to be divided equally among the siblings. Debbie stated she never made any deposits or withdrawals from that account.

Debbie also stated that Betty gave her power of attorney in 2016 and that Debbie accepted the mandate. At that time, Betty was still totally independent and was driving and managing her own finances. Debbie testified that she and Betty did not tell her brothers about the power of attorney because they "were both afraid of their reactions."

Debbie testified about her mother's health and stated that prior to 2015, Betty was very independent and cooked her own meals, managed her finances, balanced her checkbook, went to the bank and paid her bills. Until that time, Betty attended her medical appointments alone. Debbie stated that

---

[3] Debbie stated that in 2014, Eddie and Buddy threatened to sue Betty over ownership of some rental property, and Betty was afraid they would "run over me and run over her and take advantage of me if something happened to her." Debbie said she had direct knowledge of this because she was present at her mother's house when Eddie made the threat.

in 2017, she started noticing personality changes in Betty. She was living with Betty at the time because she needed help with ambulatory activities. She testified that her mother began moving bills from their usual location and placing them in strange places, i.e., under a pillow or on the couch. Once she placed her shirt and pants in the refrigerator and then denied doing it. She forgot that she had received a telephone call from Eddie and became upset because she thought he had not called her. She worried about her money, and Debbie had to repeatedly explain her financial situation to her. She was unable to update her own medical record at the doctor's office, and Debbie had to complete the required forms.[4]

Debbie also testified that in November 2017, her mother was having hip and groin pain and had to be admitted to the hospital for two days. She had a reaction to some medication and suffered a seizure. Debbie stated she saw a significant decline in Betty's health after that episode, and Dr. Meyers diagnosed her with senile dementia.[5]

Debbie further testified that after Betty left the hospital, she needed around-the-clock care. Debbie hired two people to help when she could not be present. She paid one sitter $8 an hour cash, which came from the Chase Bank account, on which both Betty and Debbie were signatories. She kept a notebook of times the sitters came and how much she paid them and also

---

[4] Dr. Meyers's deposition was admitted into evidence at trial. In September 2016, he performed a mini-mental status exam ("MMSE") on Betty and the result was abnormal, showing some mild to moderate cognitive dysfunction, which was impairing her daily living activities.

[5] In his deposition, Dr. Meyers stated that Betty's senile dementia, which causes impairment due to loss of brain tissue and functions, might have been caused by her untreated lung cancer that impaired oxygenation. He also stated that Betty had severe heart disease and had multiple interventions with stents and other procedures that would increase her vascular flow. She had heart failure from previous injuries to her heart, and all of these together created a situation that could impair cognition without a formal diagnosis of another type of dementia.

kept track of who visited Betty during this time period. During this time, Buddy did not stay with Betty at all. Eddie stayed at the hospital on November 20 and 21, but did not stay at Betty's home with her. In the month of December, neither Buddy nor Eddie stayed with their mother at home. Debbie stated that in December, Betty was still walking with her walker and had a decrease in appetite.

Debbie stated that even before December 2017, her mother was unable to understand her finances. Betty gave her the checkbook to keep because she forgot she signed a blank check and gave it to one of the grandchildren. Betty also forgot she had given Debbie the checkbook and started worrying about where it was and where her money had gone. Debbie returned the checkbook to her and tried to explain her bank statement to her, showing her which checks had cleared and which had not. She testified that she kept banking records from 2013 to the present date in a box at her mother's home and made sure her brothers knew where the records were located.

Debbie also stated that on January 31, 2018, she took Betty to see Dr. Meyers and informed him that since her hospitalization, Betty was very agitated and crying for no reason. It was at this time that Dr. Meyers diagnosed Betty with Alzheimer's.[6] Debbie did not discuss the diagnosis with her brothers.

Debbie testified that she stayed with her mother until January 22, 2018, when she, herself, was diagnosed with an active, contagious staph

---

[6] Dr. Meyers prescribed an antipsychotic medication called Olanzapine, a treatment for agitation associated with Alzheimer's; Aricept for memory loss; and Buspirone, an anti-anxiety agent that does not have sedating qualities.

infection and could not be around her mother. At that time, Eddie transitioned to staying at night with his mother. Debbie returned after a week and stayed most nights with Betty until February, 8, 2018, when she again became ill and had to leave for treatment. She was eventually diagnosed in April with colorectal cancer and had to undergo surgery, and Eddie and Buddy assumed responsibility for Betty's care.

Debbie stated her notebook reflects that on February 18, 2018, no one stayed at night with her mother, even though Debbie thought it was unsafe for her to be alone. On that date there is also a notation that says "mother and Eddie want Dawn [Dawn Younse, the sitter] gone."

Debbie testified that Eddie and Betty eventually fired Dawn, which upset Debbie because she had always been grateful for Dawn's help with her mother's physical therapy. She stated that Dawn was very patient with her mother and would repeat herself when her mother asked the same question over and over. She said it was after this that she began experiencing trouble connecting with her mother by phone.

Debbie further testified that on February 23, she wrote in her notebook, "Mother is thinking I stole from her." She stated her mother never believed she was stealing from her until after her illness and her brothers accused her of robbing her mother.

Debbie also testified that a few days later, she received a notice from Chase Bank that on February 21, a withdrawal of approximately $15,888 was made from the account. This alarmed her, but she was unable to get information from Chase Bank or Ouachita Valley Credit Union when she called to check on her mother's other assets. She stated she informed the banks that her mother had dementia, but she was told they would be unable

to speak to her unless she provided them with proof of her mother's diagnosis.

Debbie stated that she contacted Dr. Meyers, who wrote a letter dated February 24, 2018, detailing his relationship with Betty, how long he had been treating her, her memory problems, and that he knew Debbie was her primary care giver. The last paragraph stated that based on his recent encounters with Betty, he opined that she was not able to comprehend anything more than very simple questions, events or thoughts regarding her personal care, much less more complex situations such as her financial or medical issues.

Debbie further stated that she took Dr. Meyers's letter to Ouachita Valley Credit Union, which verified that a deposit had been made and a checking account opened under the name of Carl Wood. The credit union offered to freeze all the accounts, but Debbie declined to do that, stating the money was her mother's money and for her benefit and care. The credit union, however, froze all Betty's accounts except the checking account and refused to release them until its attorney could be consulted.

Debbie stated that thereafter, her relationship with Betty changed. She testified that Eddie and Buddy convinced their mother that she was stealing money from her. She was informed by Eddie and Buddy that Betty did not want her to take her to her doctors' appointments any more. Debbie subsequently learned that Eddie had taken Betty to see Rhonda Beard, a nurse practitioner, and Dr. Jenny Guerre, a neurologist, neither of whom had seen Betty previously.

Debbie testified that when she attempted to visit her mother after her own surgery, she was met with hostility from both Eddie and her mother. In

front of her mother, both Eddie and Buddy called her a thief, a liar and a crook.

Debbie also testified that, eventually, Buddy and Eddie stopped answering the phone at her mother's house, changed the locks on the doors and even replaced some doors. She stated that it was very hard to visit her mother because of the animosity created by her brothers. In March 2018, Eddie told her that if she wanted to talk to or see her mother, she would have to come through him. They completely alienated her from her mother prior to her death in July 2018. At this point, she had no idea that her mother had executed another will.

Debbie stated that after February 27, 2018, she believed her brothers had influenced their mother to sign the new power of attorney, donate the property to Eddie and change her will to make her brothers the sole heirs of her estate. She testified, "I think they had something to do with it as far as talking to Mother and I mean, why would she all of a sudden think that I was, was she paranoid that her money was gone, that I was stealing it." She was unable to say that she had direct knowledge that her brothers had taken steps to turn her mother against her.

Eddie testified that he is Chad's father but that he is estranged from him and did not have any direct knowledge of how often Chad saw Betty or helped her in any way. He stated that he had been working on a pipeline some distance from his mother, that he did not see her routinely prior to November 2017 and did not know that Debbie had been balancing Betty's checkbook and writing the bills. He stated that "to the best of his knowledge" Betty managed her own finances. He also stated that he did not believe his mother needed sitters or help in the house day and night.

8

Eddie further testified he was aware Betty had been admitted to the hospital on November 20, 2017. He was shown Dr. Meyers's records and those of St. Francis Hospital, which indicated that Betty had had multiple falls in the past, but did not indicate a fall precipitating this particular hospital admittance. The records also indicated that she had memory issues, and it was possible she could have had an injury or event that she did not remember. Eddie stated that he disagreed with anyone who said his mother was having memory problems. While Betty was in the hospital, Dr. Meyers performed a systems and cognition review and found she had some episodes of confusion, noting that the issue with her memory had been ongoing for some time. Still Eddie persisted with his disagreement with the assessment.

Eddie did not remember seeing his mother at any time in November 2017, but stated, "But the time that I was there, there wasn't no memory loss and all that." He testified that he laughed at Dr. Meyers when he said Betty had been diagnosed with senile dementia. At Betty's request, he made an appointment in March 2018 for her to be tested by a psychiatrist, informing him she was tired of people telling her that she's crazy. He stated that Betty picked the doctor herself.

Eddie testified that he saw his mother on Sundays in December 2017 and became aware that she had sitters with her. He was able to determine the cost of the sitters because Debbie kept a ledger with their hours and payments. He said his mother was private and did not discuss her financial management issues with him. He was unaware she had a walker, thought she could walk without trouble and believed none of it was his business.

Eddie was presented with evaluations made by home health care professionals in December 2017 mentioning that Betty had a history of

9

falling. He denied this and said, "They would have to show me proof." He testified that he was unaware that home health determined his mother had impaired decision making and was forgetful, a memory deficit that caused failure to recognize people and places, an inability to recall events of the last 24 hours, and that she needed supervision. Eddie denied these findings and opined that everyone his mother's age was a little forgetful. He claimed that he never knew his mother broke her hip and stated, "Somebody's been misrepresenting the truth right there." He acknowledged that Betty had slipped getting out of the shower and had broken a "ring" around her hip, but did not break her hip. He refused to admit that the home health records reflect that in December 2017, Betty' physical and mental health were not good. Eddie simply said, "You're wrong."

Eddie further testified that he thought Betty's memory was good in January 2018, but then admitted he had "begged" Debbie to take her to Dr. Meyers to obtain medication for short-term memory loss. He said he did that, "So we could use it as insurance." When questioned, he could not explain that statement, but believed he meant if she were on medication, it would ensure against her developing Alzheimer's. When asked if he meant it as preventative care, Eddie stated, "I'm done answering your questions like that. I'm done with it." A sidebar was held, and his attorney excused Eddie's demeanor as a result of a transfusion he had received.

When the trial resumed, Debbie's attorney asked Eddie whether he thought Betty had capacity at the end of February 2018 to execute a new power of attorney, donation *inter vivos* and a new will; and he responded that he did. Eddie denied awareness that on February 9, 2018, his mother was re-evaluated by home health, who still found that it was unsafe for Betty

to leave her home alone due to her confusion and that she required minimal cues for safety techniques in part due to her cognition. The attorney referenced the reports from home health personnel, which noted that on February 19, 2018, they were unable to visit Betty because the "family was uncooperative."

Home health care records indicate that approximately two weeks later, Eddie cancelled its services because he did not believe Betty needed them. Home health services discharged her on March 1, 2018, which was only two days after Will II was signed. On that same date, home health reports show that Betty still had memory deficits, failure to recognize familiar persons and places, inability to recall events of the past 24 hours and significant memory loss so that supervision was required. They also reported that she had impaired decision making, meaning the inability to appropriately stop activities jeopardizing her safety through actions. They further noted that she was still using a walker. Without having help during the month of March, Betty fell in the shower and broke her hip.

Eddie testified that Betty wanted Buddy to be the signatory on the checking account now located at the Ouachita Valley Federal Credit Union. When asked if Betty was in good shape cognitively and why could she not write her own checks or balance her checkbook, he answered that was what she wanted.

Eddie also testified that he took Betty to see Dr. Meyers in March 2018 because she wanted to know why he had written the February 24, 2018 letter for Debbie. He denied that Underwood, after drawing up the new will and donation, had advised him to have Betty's regular physician examine her. He stated that Dr. Meyers suggested that Betty be given the mental

11

examination for dementia or Alzheimer's, but Betty refused and they left the office. Dr. Meyers wrote in his notes that day that Eddie and Buddy became belligerent with him.[7] Eddie said, "That's a lie."

Eddie testified that on April 2, 2018, he took his mother to see Beard, who had once been Eddie's daughter's neighbor and with whom he had an established history. He claims he went there because Dr. Meyers would not refill Betty's prescriptions. He was asked what his response would be if Dr. Meyers's records showed that on the day he left the clinic Dr. Meyers called in refills for the prescriptions, and Eddie responded, "He didn't. It's a matter of record." Eddie was confronted with the facts that Dr. Meyers did refill Betty's prescription for Buspirone. Beard first said Betty did not need to be on that medication, but then prescribed it herself. When Betty complained of hip pain, Beard referred her to an orthopedic doctor who recommended that she go to the hospital that day. Betty did not want to go and refused.

Dr. Guerre's notes indicate that Betty was brought to see her by one of her sons (Eddie denies that he took her) on May 2, 2018. Her report states that "the son" provided her with Betty's history and asked if his mother had the mental function to make financial decisions and take care of her affairs.[8]

_____

[7] In his deposition, Dr. Meyers stated that the behavior of Eddie and Buddy he found belligerent was voicing their opinion loudly, saying that they knew what was going on as if implying he had some ulterior motive for pursuing the repeat of the MMSE. He stated that on that day in March, Betty would not have had the capacity to make donations or change her will. He stated that they left the office before he could return to conduct the test and that he was concerned because Betty was being left at home without any assistance. He also stated that he did not examine Betty on the day she went to the attorney and changed her will and made the donation, so he could not say what her competency was that particular day, but if she were anything similar to what she had been that day in his office, she was not competent to make the changes.

[8] Dr. Guerre's report recites Betty's "history of present illness" and states:

Dr. Guerre stated that after an hour of testing, she found Betty's memory was "Lower than would suggest the reported level of function prior to her fall." In regard to competency, she stated that Betty had "appropriate insight (she is aware of her loss of short-term memory) and seemed … fully able to understand and communicate a choice in relation to her everyday life."[9] She concluded that she did not find any indicators to suggest that Betty was not competent to make her own decisions.

Eddie further testified that it was his mother's idea the day they went to the bank. At the time, she believed Debbie was stealing from her because there was a $1,500 discrepancy between her balance and her checkbook. The attorney pointed out that the discrepancy was easily explained by a check for tree removal that had not yet cleared. Eddie admitted that there was never any proof that Debbie had stolen from his mother, that he never tried to dissuade his mother in her belief and that he fully supported her going to Underwood's office on February 27 to execute Will II. He denied ever urging on his mother's paranoia about Debbie's alleged dishonesty. He claimed to never have seen Will I and testified that his mother decided she

Here today with son, they report memory problem onset 2 years ago, she would repeat herself, has mildly progressed. They deny words finding difficulty. Up to a month ago she was living by herself and was independent for all her functional and routine daily activities. She was paying her bill on time, was driving without getting lost, was taking care of her grocery shopping, and was taking care of her bank account. A month ago while at her house she slipped while wearing slippery socks and broke her right hip, she had right hip replacement surgery 2 weeks ago and moved with one of her son 1 month ago due to limited mobility. Prior to her hospitalization she was ambulating without any ambulatory aid and deny any balance problem. Currently Receiving homehealth PT, ambulate with her walker, was able to walk without the walker during PT recently. Patient herself noted she was forgetful. Mother had memory problem. She denies any auditory or visual hallucination, no mood swing per son.

[9] Dr. Guerre also noted that "The report by the patient and her son that up to prior (*sic*) her fall in April she was successfully managing her bill independently and the fact she scored 2/2 on abstraction evaluation are strong indicator of preserved capacity in making decision regarding finance."

13

wanted to cut Debbie out of the will entirely. Despite denying ever having seen Will I, he admitted to threatening to sue his mother in 2014 because "Mama acted like she knew more about law than anybody" and "She was trying to cut Buddy out of that will, me out of that will." When asked, "What will was that?" Eddie responded, "That would have been the one that they would have had if they had went on with that will they talking about."

When asked about the visit to Underwood's office on February 27, 2018, Eddie gave conflicting testimony regarding many aspects of the visit. He claimed that he and Buddy were not present in the room while Betty told Underwood what she wanted. Underwood's deposition asserts otherwise.[10] Eddie testified that he told Underwood that day his mother had been diagnosed with Alzheimer's dementia, and the attorney conducting the questioning said, "That's the first time I've heard that." Eddie replied, "That's the first time you've asked." He also testified that Underwood did not ask his mother any questions about her health care or treatment. He stated he had not taken any records from Dr. Meyers to Underwood's office,

---

[10] Underwood's deposition was entered into evidence later in the trial. He stated that Eddie and Buddy brought their mother to him to ask questions about suing Debbie for conversion of her bank account and that she was suspicious that her daughter may have wrongfully taken some of her money through a power of attorney. He also stated that Betty was upset with Debbie because she believed she was not being treated right and was disappointed that her daughter had or was suspected of stealing her money. He was also told by Betty that she had been "blackballed" by the bank and that they would not discuss her accounts with her. In March 2018, he went to the bank and confirmed that fact, but the bank would not reveal why they would not speak to Betty. He did not ask if Betty had been treated by a physician or diagnosed with any medical conditions, and no medical records were provided to him. He was unaware that Betty had been diagnosed with senile dementia or that she took medication prescribed for Alzheimer's treatment. He found Betty to be articulate, spry, charming, energetic and sharp during their meeting, and he had no doubt that she understood her actions that day. He further stated that he suggested to Eddie and Buddy that they take Betty to her regular physician to have her assessed "as to her ability to make financial decisions." He was unaware that Dr. Meyers had found she lacked capacity to a point predating February 27, 2018.

but he did take the record from the one-hour interview with Dr. Guerre.[11] No other medical records were provided to Underwood.

Buddy testified that Betty believed Debbie was stealing from her because of the letter presented to the Ouachita Valley Credit Union, which resulted in her accounts, other than the checking account, being frozen. He stated that his mother was upset about it and thought Debbie was stealing. He said Debbie knew what his mother was mad about. That is the only "proof" he had that Debbie was stealing from his mother. He testified that the day Betty's accounts were locked, he asked Debbie to go to the credit union with him to attempt to get them released, and she agreed to do that. Buddy said that he asked Debbie, "To take the letter off." Debbie did not want to "take the letter off" and Buddy interpreted that to mean she did not want to "unblock" the accounts. He stated that he informed Betty, who was "steaming mad," that Debbie would not release the funds in the savings account. Because Betty could not access her accounts, they immediately made an appointment to see Underwood because she was upset and broken-hearted about the letter from the doctor and her accounts being frozen.

Chad testified that Betty started losing her memory in 2016 and had ceased driving by November 2017. He stated he cooked at various nursing homes and had experience with elderly people with Alzheimer's dementia or cognitive impairment. His grandmother admitted to him that she was unable to care for herself physically and financially and that Debbie had to help her with her checkbook and medications. He testified that in December 2017 and January 2018, he noticed changes in his grandmother's mood and

_____

[11] Dr. Guerre's report states that the date she examined Betty was May 2, 2018.

behavior. She was irritable for no reason and would get angry at everyone for simple things, such as using plastic wrap instead of foil. He never heard Betty call Debbie derogatory names.

On March 21, 2022, the trial court issued written reasons for judgment and noted that the issue before it was whether Betty understood the consequences of executing a new will, power of attorney and donation *inter vivos* on February 27, 2018. It stated that its inquiry centered around La. C.C. arts. 1471, 1477, 1478, 1479 and 1983 and case law. It noted that to have the necessary capacity to make either a donation *inter vivos* or a donation *mortis causa*, a person must be able to comprehend generally the nature and consequences of the disposition that they are making and appreciate its efforts. Capacity is presumed, but the presumption may be overcome by clear and convincing evidence to the contrary.

After examination of the testimony, medical opinions, the applicable timeline and the law, the trial court deemed Betty to be an elderly Alzheimer's patient who was without the ability to sufficiently understand complex situations of the degree associated with the action, and "For sure, . . . was not able to understand the overall 'effects' of her actions." For these reasons, it concluded that the donations of February 27, 2018, were invalid due to the lack of capacity. A written judgment to that effect was signed the same day and notice was sent to all parties on March 23, 2022.

On March 30, 2022, Eddie and Buddy filed a motion for new trial citing La. C.C.P. arts. 1972 and 1973. A hearing was held on the motion on September 14, 2022. No new evidence was presented. After argument, the attorneys left the courtroom, and the trial court immediately granted the new trial and gave written reasons, which were read into the record. It vacated

16

the judgment previously rendered and rendered judgment in favor of Eddie and Buddy determining that Will II would be enforced.

In granting the motion for new trial, the trial court stated that it believed it had erred in its previous ruling as a result of the "destructive dozen." In particular, it noted that it erred with regard to the presumption of capacity and noted that it had been persuaded by the attorney's argument regarding Underwood's testimony indicating that Betty might have had lucid intervals and that she seemed to understand her actions on the day in question in his office. It reviewed testimony and implied that Debbie was the actual cause of Betty changing the will because she "tinkered with Ms. Betty's bank account at the credit union." It also noted that several witnesses saw Betty reviewing her bank accounts and expressing knowledge of things she owned. The court took note of Eddie's and Buddy's argument that "the position of a notary as a degree of weight that perhaps the Court in this instance minimized or did not actually weigh." It then reviewed the medical evidence presented by Eddie and Buddy, which it believed contradicted that presented by Debbie and Chad. Finally, it stated, "That being the case, the Court finds that that is a basis for finding that we were in error . . . and that the parties . . . failed to carry the burden of proof which is a clear and convincing standard on the issue of lack of capacity, hence, the Will in question is deemed to be valid." The donation *inter vivos* was also deemed valid.

Debbie and Chad appeal the judgment granting the new trial, vacating the earlier judgment and granting judgment in favor of Eddie and Buddy, which recognized the validity of the donation *inter vivos* and Will II. An

17

order previously entered appointing Debbie as the executrix was set aside and declared null.

## DISCUSSION

### *New Trial*

Debbie and Chad argue that the trial court erred in granting the new trial because it misapplied the presumption of capacity. It found the medical evidence insufficient to prove lack of capacity, ignored the law and facts regarding Underwood's testimony and found that the original judgment was not supported by the facts and testimony in evidence.

Eddie and Buddy argue that the trial court correctly granted the new trial because Debbie and Chad failed to prove Betty lacked capacity, that the evidence they presented proved she did have capacity, that Underwood's testimony should have been given greater weight and that the original judgment was incorrect.

The peremptory grounds for granting a new trial are: (1) When the verdict or judgment appears clearly contrary to the law and the evidence; (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial; and, (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done. La. C.C.P. art. 1972. La. C.C.P. art. 1973 states that a new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.

Under La. C.C.P. art. 1972(1), a new trial shall be granted when it appears clearly contrary to the law and evidence in that the trial court is convinced that the judgment "would result in a miscarriage of justice." *Rivet v. State, Dep't of Transp. & Dev*., 01-0961 (La. 11/28/01), 800 So. 2d 777.

18

The court cannot set aside a judgment "if it is supportable by any fair interpretation of the evidence." *Martin v. Heritage Manor South*, 00-1023 (La. 4/3/01), 784 So. 2d 627; *Cash Point Plantation Equestrian Ctr., Inc. v. Shelton*, 40,647 (La. App. 2 Cir. 1/25/06), 920 So. 2d 974.

The applicable standard of review for a trial court's ruling on a motion for new trial is whether the trial court abused its discretion; this standard applies whether the motion was peremptory or discretionary. *Sullivan v. Brookshire Grocery Co.*, 54,535 (La. App. 2 Cir. 9/21/22), 348 So. 3d 872.

The court is authorized, on motion for new trial in a nonjury case, to use the testimony and documents already in evidence and reconsider the previous judgment. *Fulco v. Fulco*, 50,256 (La. App. 2 Cir. 11/18/15), 183 So. 3d 573. The court has great discretion to admit new evidence or merely to reconsider the existing evidence in light of the arguments. *Id.* Normally, if an appellate court finds that the trial court committed a reversible error of law or manifest error of fact, the appellate court must ascertain the facts de novo from the record and render a judgment on the merits. *Oubre v. Eslaih*, 03-1133 (La. 2/6/04), 869 So. 2d 71.

Unless the trial court abuses its discretion in ruling on a motion for new trial, its decision will not be overturned. *Staten v. Glenwood Reg'l Med. Ctr.,* 53,220 (La. App. 2 Cir. 1/29/20), 290 So. 3d 280, *writ denied*, 20-00591 (La. 9/23/20), 301 So. 3d 1184. A grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur. *Id.*

All persons have capacity to make and receive donations *inter vivos* and *mortis causa*, except as expressly provided by law. La. C.C. art. 1470. Capacity to donate *inter vivos* must exist at the time the donor makes the

donation. La. C.C. art. 1471. Capacity to donate *mortis causa* must exist at the time the testator executes the testament. *Id*. There is a presumption in favor of testamentary capacity. *In re Succession of Furlow*, 44,473 (La. App. 2 Cir. 8/12/09), 17 So. 3d 475. Testamentary capacity means the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. *Id.*, *citing* La. C.C. art. 1477. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time he executed the testament. La. C.C. art. 1482. The issue of capacity is factual in nature; the ultimate finding that the testator either possessed or lacked capacity cannot be disturbed unless clearly wrong or manifestly erroneous. *In re Succession of Furlow, supra*.

In the case at bar, we find the trial court abused its discretion in granting the new trial. None of the peremptory reasons for granting a new trial found in La. C.C.P. art. 1972(1) or (2) or a discretionary ground of La. C.C.P. art. 1973 can be found in a review of the record before us. The original judgment was not clearly contrary to the law and evidence and is supportable by a fair interpretation of the evidence. The parties did not discover, after the trial, evidence important to the cause which they could not have obtained before or during the trial. In fact, the trial court did not consider any new evidence when it granted the new trial. Last, there did not appear to be any good discretionary cause for granting a new trial. The reasons given by the trial court were erroneous, and a new trial should not be granted to give the losing party a second bite at the apple.

The original judgment finding Betty lacked capacity to make the donation *inter vivos* and Will II was not contrary to the law and the

20

evidence. In fact, the decision that the legal presumption of capacity was overcome was wholly supported by Debbie's testimony and that of Dr. Meyers, Betty's attending physician of 15 years.

To reiterate the timeline pertinent to this action: In 2015, the year she signed Will I, Betty was clearly competent to take care of herself, her home, her needs and her finances. In 2016, she exhibited signs that she had some mild cognitive deficiencies and gave Debbie her power of attorney. By November 2017, Betty was showing increased memory loss, agitation and anxiety. She was unable to care for herself or her finances and required help from her daughter, sitters and home health care personnel. In December 2017, she was diagnosed by Dr. Meyers with Alzheimer's dementia. In February 2018, Eddie and Carl began caring for Betty; and within three weeks, they convinced her that Debbie was stealing from her. They removed all of the money from her checking account she shared with Debbie, placed it in an account with Buddy as the cosignatory and took Betty to have a new will prepared that made them the sole beneficiaries and donated land to Buddy that had previously been willed to Chad. Underwood saw Betty one day and was not told that Betty had been diagnosed with Alzheimer's dementia or that Debbie had been taking care of her and her finances and her home health pursuant to Dr. Meyers's diagnosis. Eddie and Carl misled Dr. Guerre by telling her that Betty had been self-sufficient until April 2018 and had been living alone and handling her own finances until then, when actually Debbie had been taking care of her mother and her finances since 2016.

Betty's medical and care personnel agreed she had been needing care at home for years prior to Eddie and Buddy's intervention. Until they took

21

over Betty's care, she had been content to allow Debbie to help her with her finances and her health care, even giving Debbie her power of attorney, which authorized her legally to do so. The testimony regarding her need for financial advice, her need for home health care and assistance with day-to-day living, her doctor's advice that she not be left alone, and her Alzheimer's diagnosis, combined with her apparent malleability to the influence exerted upon her by Eddie and Buddy, indicate that Betty lacked the capacity in 2018 to make a new will and donation. For these reasons, we find that the presumption of capacity which exists in the law was overcome by the evidence presented at trial.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the trial court granting the new trial and the subsequent judgment rendered in favor of Eddie Wood and Carl Wood and reinstate the original judgment in favor of Deborah Wood and Chad Wood finding that Will I (2015) is valid. Costs of the appeal are assessed to Eddie Wood and Carl Wood.

**APPEAL GRANTED; JUDGMENT OF NEW TRIAL VACATED; JUDGMENT VACATED; ORIGINAL JUDGMENT REINSTATED.**